IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2017

**STATE OF TENNESSEE v. RODNEY JENNINGS**

**Appeal from the Criminal Court for Hamilton County**
**No. 292497   Thomas C. Greenholtz, Judge**

———————————————————

**No. E2017-00330-CCA-R3-CD**

———————————————————

A Hamilton County jury convicted the Defendant, Rodney Jennings, of second degree murder, and the trial court sentenced him to serve twenty-five years in the Tennessee Department of Correction. The Defendant appeals, asserting: (1) the trial court improperly allowed into evidence testimony concerning the Defendant's gang affiliation and the Defendant's 2013 domestic assault conviction; (2) the State improperly impeached the Defendant during cross-examination; and (3) the evidence is insufficient to support his conviction. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Rodney Jennings (on appeal), pro se, Hartsville, Tennessee; Brandy Spurgin and Brian Pearce (at trial), Chattanooga, Tennessee, for the appellant, Rodney Jennings.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; M. Neal Pinkston, District Attorney General; Cameron Williams and Kristen D. Spires, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a domestic dispute over visitation with the Defendant and Cheslei Thompson's children, which resulted in the Defendant shooting and killing Ms. Thompson's cousin, Raphael White. A grand jury indicted the Defendant for second degree murder and possession of a firearm with a violent felony conviction. One of the issues the Defendant raises on appeals is the admission of testimony about a 2013

domestic assault. As such, we separately summarize the testimony from the 404(b) hearing before providing the summary of the trial testimony.

## A. 404(b) Hearing

The State sought to introduce proof of a June 2013 domestic assault conviction, involving Ms. Thompson and the Defendant's children. The State submitted that the evidence was relevant to show the Defendant's intent related to the second degree murder charge, demonstrating similarities between the 2013 episode and the 2014 shooting. The State, through Jean Rogers, a Hamilton County 911 Record Specialist, introduced two 911 calls made from a neighbor's residence recorded at 1:11 a.m. on June 5, 2013. The defense, through the same witness, introduced two 911 calls placed from Waffle House on East 23rd Street. These calls were made by a man who identified himself as "Rodney" at 4:22 a.m. and 5:02 a.m. on June 5, 2013.

Brian Angel, a Chattanooga Police Department officer, testified that, in June 2013, he was dispatched to a residence on 6th Avenue in Chattanooga, Tennessee, at approximately 1:30 a.m. When he arrived, he observed a female, Ms. Thompson, outside who appeared "very hysterical." There was blood "all over her," and he noticed a broken window on the front of the apartment. Ms. Thompson explained to the officer that her "child's father," later identified as the Defendant, had broken the window and there was "some kind of struggle" during which she was cut on the broken glass. The Defendant made entry but fled prior to the officer's arrival. Officer Angel testified that Ms. Thompson had cuts on her forearms. He also observed two small children inside the residence.

Officer Angel testified that, within a couple hours of his initial contact with Ms. Thompson, the Defendant arranged to turn himself in to the police at a Waffle House parking lot located on 23rd Street. On cross-examination, Officer Angel was asked about whether there was "a lot of gang activity" in the 6th Avenue apartment complex, and he replied, "Sure."

Ms. Thompson testified that she and the Defendant had been in a relationship and had two children together. The couple had never married but had lived together intermittently. Ms. Thompson explained that the Defendant lived with her at the 6th Avenue residence for "a couple of months" before he moved out due to an argument. In June 2013, after the Defendant had moved out, he returned to "visit." During the visit, a Chattanooga Housing Authority employee appeared at the residence and issued the Defendant a citation for "yelling in [Ms. Thompson's] face" and banned the Defendant from the property.

Ms. Thompson testified that several days later, on June 5, 2013, a friend of hers was spending the night. She recalled that Kionna Glenn[1] and Ms. Thompson's two children were at the residence that night when the Defendant came to the door. Ms. Glenn let the Defendant inside and, once inside, he instigated an argument with Ms. Thompson. The Defendant and Ms. Thompson were in an upstairs bedroom with their children, and the Defendant accused Ms. Thompson of engaging in a sexual relationship with Kionna. The argument escalated to an assault during which the Defendant hit and pushed Ms. Thompson. The Defendant and Ms. Thompson moved their altercation downstairs where the Defendant hit Kionna. The children began crying, and the Defendant grabbed their older son, then four years old, and pushed him against the wall. "[F]inally" the Defendant exited out the front door.

Ms. Thompson testified that the Defendant could not re-enter the residence because she quickly locked the front and back door after his departure. Because he was unable to enter through a door, the Defendant broke the kitchen window. As the Defendant entered through the window, Ms. Thompson tried to push him back out, cutting her hands and arms on the broken glass in the process. The Defendant entered through the window and hit Ms. Thompson in the kitchen before walking to the living room area where he paced. According to Ms. Thompson, the Defendant dropped his phone, told Ms. Thompson to call the police, and then left. Ms. Thompson used the Defendant's cell phone to call the police. Ms. Thompson was transported by ambulance to the hospital where she was treated for her injuries. The Defendant was later arrested and served six months in jail for this incident.

Ms. Thompson testified that the Defendant was released from jail in December 2013. He contacted her approximately two weeks after his release via Facebook to ask if he could see the children. Ms. Thompson agreed, and the Defendant picked up the children at Ms. Thompson's mother's residence. Later that night, Ms. Thompson retrieved the children from the Defendant. Approximately two weeks before the shooting in this case, she again allowed the Defendant to take the children for a few hours. The Defendant picked up the children from her 6th Avenue residence and returned them there.

On January 28, 2014, the Defendant appeared at her front door asking to see the children. The older child was at Ms. Thompson's mother's residence, and the two-year-old was upstairs sleeping. Ms. Thompson explained this to the Defendant and told him she would not wake up their younger child. She told him he should come back another time. The Defendant continued asking to see the sleeping child. Raphael White, the victim, told the Defendant "we don't want any problems," and the Defendant "said the

---

[1] At this point in the transcript, Ms. Thompson refers to "Kionna" only by her first name. It becomes clear from the trial testimony, however, that she is referring to Kionna Glenn.

- 3 -

same." The Defendant backed out the door, put his hand into his pocket when he was out in the hall. As the victim was shutting the door, Ms. Thompson heard a gunshot. Ms. Thompson testified that the victim did not have a gun and that she did not see the gun that shot the victim. After shooting the victim, the Defendant fled.

On cross-examination, Ms. Thompson testified that on the night of the June 2013 assault the Defendant was "out of control," but on the night of the January 28, 2014 shooting the Defendant was calm and there was no "fight."

After hearing this evidence, the trial court granted the Defendant's motion seeking to exclude any testimony about the June 2013 domestic assault. In further discussions about potential testimony, the trial court advised defense counsel that, if the defense "open[ed] the door to the [2013] domestic assault, the rest of it comes in."

### B. Trial Testimony

During the trial, the parties presented the following evidence: Larry Ellis and Matthew Bond,[2] Chattanooga Police Department ("CPD") officers, were the first responders to a homicide scene located at East Lake Court housing project on 6th Avenue. As Officer Ellis approached the entryway to the unit, he saw the victim lying on the floor near the door, and three females and one male who were "very emotional and screaming." The officers separated the witnesses from the victim by moving the witnesses into the living room area. The officers also conducted a protective sweep of the unit and other than the previously mentioned adults and one child, found no one else present. Officer Ellis testified that the witnesses identified the shooter and described the truck that he left in. The victim was transported to the hospital, and the witnesses were transported to the police station for questioning.

James Metcalfe, the Hamilton County Chief Medical Examiner and Forensic Pathologist, testified as an expert witness in the field of forensic pathology. After examining the victim's body, Dr. Metcalfe concluded that the victim's manner of death was homicide and that the cause of death was a gunshot wound to the chest. Dr. Metcalfe explained that the "main injury" was caused by a bullet that traveled through the victim's left ventricle and left lung. He stated that this type of wound was fatal. Dr. Metcalfe collected the bullet from the victim's back just under the skin. The Chattanooga Police Department collected the bullet as part of the investigation.

---

[2] At the time of trial, Mr. Bond was a salesman for an insurance company based in Ringgold, Georgia.

- 4 -

Tirrea Tony testified that she was present in Ms. Thompson's apartment ("6th Avenue unit") at the time of the shooting. She said she was in the living room when the Defendant knocked on the door. Ms. Thompson opened the door to him, and the two argued in the kitchen about the Defendant seeing the children. Ms. Tony recalled that the younger child was asleep in the apartment, but the older child was not there. According to Ms. Tony, Ms. Thompson told the Defendant he should leave. The victim came into the kitchen and reiterated that the Defendant needed to leave, saying "I don't want no problems." The Defendant responded that he did not want "no problems" either and walked out the door. The victim walked to the door to shut it, and the Defendant shot the victim in the chest. Ms. Tony testified that she did not see the victim with any weapon that night and did not hear him threaten the Defendant.

On cross-examination, Ms. Tony confirmed that the Defendant was "aggressive" toward Richard Morris at Ms. Thompson's residence on the day of the shooting. When presented with her testimony from the preliminary hearing, Ms. Tony agreed that at the preliminary hearing she said that the Defendant showed no signs of aggression but maintained that her trial testimony was more accurate. Ms. Tony reiterated that the Defendant and Ms. Thompson were in the kitchen where he was talking like he was "mad at her" when the victim entered and told the Defendant to leave. Ms. Tony said the Defendant was pacing back and forth at the time and then walked out the door into the "public hall." Ms. Tony confirmed that she did not see the gun or the gunfire.

Ms. Tony testified that, at the time of the shooting, the victim had "[h]is flag" in his pocket and his cell phone. After playing the 911 recording again, Ms. Tony agreed that she did not tell the 911 operator, when asked, who shot the victim and that she also denied knowing where the victim was shot. Ms. Tony, however, maintained that she was certain it was the Defendant who shot the victim.

On redirect examination, Ms. Tony testified that she knew the Defendant as "Roscoe" and was unaware of his full name on the day of the shooting. She identified the Defendant in court as the man who shot the victim on January 28, 2014.

Ronald White testified that Ms. Thompson was his sister and that the victim was his cousin. Mr. White recalled that he had stayed at his sister's residence the night of January 27, 2014, and was still there on January 28 when the Defendant came by asking to see his children. The Defendant knocked on the door, and Ms. Tony called upstairs to Ms. Thompson, who was in her bedroom with a "male friend . . . [Richard Morris]." Ms. Thompson went downstairs and opened the door to the Defendant. The victim knocked on the door of the room Mr. White was in and "told him to come down the steps" with the victim. The victim and Mr. White went downstairs and into the living room.

- 5 -

Mr. White testified that he overheard the Defendant and Ms. Thompson talking about their children. At some point, Mr. Morris came downstairs, and the Defendant asked Mr. Morris if he "was [ ] messing with [Ms. Thompson] now." Mr. Morris denied "messing with" Ms. Thompson, stating that she was "[j]ust [his] home girl." The Defendant told Mr. Morris that he had "no problem" with him, Mr. Morris left, and the Defendant and Ms. Thompson resumed their conversation about their children. The conversation between the two turned "loud," and Mr. White urged the Defendant and Ms. Thompson to "calm down" for the sake of their children.

Mr. White testified that the conversation between the Defendant and Ms. Thompson again escalated, so the victim walked into the room, opened the door for the Defendant, and said, "we don't want no problems." The Defendant said that he did not want "no problems either" and then the shooting occurred. Mr. White said he was standing behind the victim and did not see the Defendant fire the gun but noted that the Defendant was the only person standing in the doorway. After the gunfire, the victim fell backward toward Mr. White, and Mr. White "pulled him in." Mr. White said that the victim grabbed his chest and was shaking. When Mr. White lifted the victim's shirt, he saw the gunshot wound and immediately ordered the others to call 911. He said that everyone was in shock and "flipping out," so he grabbed a phone and called 911.

Mr. White testified that, before the shooting, the victim did not threaten the Defendant or make any threatening gestures toward the Defendant. He said that the victim was closing the door when the Defendant shot him.

On cross-examination, Mr. White said that he used the victim's cell phone to call 911 and that he retrieved the cell phone from the counter. Upon review of the transcript from the preliminary hearing, Mr. White agreed that he had previously testified that the cell phone had been in the victim's pocket but that someone had handed it to him to call 911. Mr. White explained that the circumstances were very stressful, and he was unsure of whose phone he had used to place the 911 call. Mr. White stated that the victim's "child mother" retrieved the victim's phone several days after the shooting. Mr. White confirmed that in November 2009, he was convicted of burglary and theft.

Ms. Thompson testified that in January 2014 she lived in the 6th Avenue unit with her two children, who were two and four years old at the time. Ms. Thompson explained that the victim was her cousin and Mr. White was her brother.

Ms. Thompson testified that she and the Defendant had been in a relationship for six years and, at one point, the Defendant had lived in the 6th Avenue unit with her but had moved out in June 2013. In the late afternoon of January 28, 2014, Ronald White, Raphael White, Ms. Tony, Mr. Morris, and "Lanesha" were present at the apartment.

The Defendant came to the residence to "chill." She recalled that Ms. Tony heard the knock at the door and yelled upstairs to Ms. Thompson that the Defendant was at the door. Ms. Thompson was in her upstairs bedroom with her youngest son and Mr. Morris.

Ms. Thompson testified that she went downstairs and opened the door for the Defendant. Around that time, Mr. Morris was leaving. The Defendant and Mr. Morris exchanged a few pleasantries and then Mr. Morris left. The Defendant asked to see their youngest child, and Ms. Thompson explained that he was sleeping. The Defendant urged Ms. Thompson to go and wake the child so he could see him, but Ms. Thompson declined, suggesting the Defendant come over to see their children another time. The Defendant asked Ms. Thompson for a cigarette, and she told him she did not have any. She continued to encourage him to leave, acknowledging that as she did so, she became "kind of loud." The victim then approached the Defendant saying "we don't want no problems," and the Defendant reiterated the same and began walking toward the door with his "hands up." As he walked out the door, he put his hand back in his pocket. The victim took hold of the door to shut it, and then Ms. Thompson heard gunfire. Ms. Thompson said that she did not see the gun but that the Defendant was the only person in the public hallway. After the gunfire, the Defendant took off running. Initially, she did not realize that the victim had been shot, but when the victim's shirt was lifted, she saw a gunshot wound.

Ms. Thompson testified that while Mr. White and Ms. Tony called 911, she checked to see if the victim had a pulse. Police officers arrived first, followed by the ambulance that transported the victim to the hospital. Everyone else in the residence was taken to the police station. Ms. Thompson stated that, before the shooting, she did not hear the victim threaten the Defendant nor did the victim have a gun on his person.

Caleb Brooks, a CPD crime scene investigator, testified that on January 28, 2014, he responded to Erlanger Hospital about a potential homicide. Once he arrived, he learned that the victim had died. Officer Brooks collected evidence and then proceeded to the crime scene. At the crime scene, Officer Brooks took photographs and then placed evidence markers where there were items to be collected and video-recorded the scene. Officer Brooks observed what appeared to be a blood stain on a window seal and on the porch. He collected samples of both substances and swabbed the door handle for DNA testing. Officer Brooks stated that he and another officer searched the residence and found no firearms.

Steve Scott, a Tennessee Bureau of Investigation ("TBI") forensic scientist, testified as an expert witness in firearms identification. Special Agent Scott stated that he had received a bullet for forensic examination. His examination revealed characteristics consistent with Winchester brand ammunition and generally associated with a .38 or .357

caliber bullet. Special Agent Scott stated that "typically" a .38 Special caliber revolver left residue within a four to five foot range from the muzzle of the gun. Nonetheless, he stated that if he did not find any residue, he could not "really form an opinion."

Kendall Stoner, a TBI forensic scientist, testified as an expert witness in forensic biology, specifically DNA testing. Special Agent Stoner tested potential blood samples taken from the front porch of the building and from the window seal. Both swabs tested negative for the presence of blood. She also tested a swab for "touch DNA" taken from the interior door handle of the "main entrance door." The results did not indicate the presence of human DNA. The results from a swab of the front exterior door handle did not reveal a DNA profile.

Tim Pickard, a Chattanooga Police Department officer, testified that he was assigned to the fugitive unit and became involved in this case in February 2014 after other officers were unable to locate the Defendant. Officer Pickard said that typically, members of the unit will conduct interviews with relatives, close family members, or other people associated with a suspect in order to gain information on the suspect's location. After investigating numerous possible connections to the Defendant, the fugitive unit obtained information that the Defendant was no longer in the Chattanooga area. Information about the Defendant was provided to the U.S. Marshals and subsequently Officer Pickard learned that the Defendant was found and arrested in Memphis, Tennessee on March 17, 2014.

James Plumlee, a CPD homicide detective, testified that, on January 28, 2014, he arrived at the crime scene at approximately 8:30 p.m. All potential witnesses had been transported to the police station for questioning, and the crime scene area had been "taped off" to protect any potential evidence. Detective Plumlee conducted the recorded interviews with Ms. Tony and Ms. Thompson. After officers had interviewed all the witnesses, they met to share the information learned and developed the Defendant as a suspect. The police department issued a "Be On The Lookout" ("BOLO") for the Defendant. Further, patrol officers were sent to addresses of some of the Defendant's relatives in an attempt to locate the Defendant.

Detective Plumlee testified that he went to the Defendant's father's residence and spoke with the Defendant's father and searched the residence for the Defendant. The Defendant's father said that the Defendant had contacted him from a blocked number and that he had tried to convince the Defendant to turn himself in and talk with the police. The Defendant's father also disclosed that the Defendant "hangs out" with Prentice Barnette. Police followed this lead but were unable to locate the Defendant. On February 9, 2014, the police department issued a video about the homicide on Crime Stoppers. The police received tips about the Defendant's possible location as a result of

the video but still the Defendant was not located. In February, the search for the Defendant was transferred to the fugitive unit. In March, the Defendant was located in Memphis, Tennessee and transported to the Hamilton County jail. Detective Plumlee confirmed that the weapon used in the shooting was not recovered.

The Defendant testified that he had two children with Ms. Thompson. He said that he stood five feet three inches tall and weighed 138 pounds in January 2014. About visitation with his children, the Defendant said that, following the end of his romantic relationship with Ms. Thompson, on the day he wanted to see the children he would contact Ms. Thompson via Facebook or call Ms. Thompson's mother, Marylyn[3] Thompson.[4] The Defendant stated that he was "homeless" but, when he had time with his children, he would go to a family member's or friend's house. He usually had the children in six or seven hour increments and would make arrangements for "a ride" to return the children to Ms. Thompson at East Lake Courts.

The Defendant recalled the week before the shooting. He said that he had picked up the children from Marylyn Thompson's house. At the end of his time with the children, however, he could not obtain a ride to take the children home so he called Ms. Thompson asking if she would come get the children. Ms. Thompson agreed, and the Defendant told her to meet him at "54th and St. Elmo Avenue" because he did not want the victim and Mr. White to know where he stayed. Ms. Thompson arrived, with Mr. White driving, later than expected and appeared "all mad" and "agitated." She rushed the children into the car and would not speak to the Defendant.

The Defendant testified that he had known the victim and Mr. White for many years. He explained that the victim and the Defendant's younger brother, Nathan Jennings, had gone to school together. The Defendant recalled that approximately two years before the shooting, in 2012, the Defendant and the victim had engaged in an argument at Marylyn Thompson's residence. The Defendant said that he had gone to Marylyn Thompson's residence to see Ms. Thompson. While still outside, the victim approached the Defendant and accused him of "disrespecting Mar[y]lyn Thompson." The two began to argue and "tussle," but no one was hurt during the exchange. He described the victim as six feet one inch tall and weighing approximately 175 pounds in comparison to the Defendant's smaller stature.

---

[3] Marylyn Thompson's first name is spelled "Marylyn" and "Marilyn" in the transcript. For purposes of consistency, we will use the initial spelling of "Marylyn."
[4] Due to Cheslei Thompson and Marylyn Thompson sharing the same surname, for clarity, we refer to Cheslei Thompson as "Ms. Thompson" and Marylyn Thompson by her full name.

The Defendant confirmed that he was convicted of robbery in 2006 and domestic violence and vandalism. As to the latter two offenses, the Defendant explained that he was "staying with" Ms. Thompson at her 6th Avenue unit. Ms. Thompson had a friend over at the time, and the Defendant wanted the friend, Kionna Glenn, to leave because he felt that Ms. Thompson "act[ed] funny toward[ ] [him]" in Ms. Glenn's presence. Ms. Thompson refused to ask Ms. Glenn to leave, so the Defendant left to "drink" and "stuff like that." When the Defendant returned, he again raised the issue of Ms. Glenn leaving, and Ms. Thompson "just went off." The two began to argue and "stuff." He felt badly about the exchange, so he left his cell phone with her to call the police and walked to Waffle House.

The Defendant testified that, while he was incarcerated for the domestic assault conviction, he spoke with his brother on the phone. His brother told him to be careful because the victim had threatened to "get" the Defendant when he saw him next. The Defendant and victim were incarcerated at the same facility for a period of time, and the victim confronted the Defendant verbally about the incident with Ms. Thompson but initiated no physical contact. The Defendant avoided the victim after that.

The Defendant testified that he had seen the victim before with a gun at Marylyn Thompson's residence. He recalled that he was on the front porch of the residence when the victim arrived. The victim's eye was swollen and bleeding, and the Defendant saw a gun in the victim's back pocket as the victim paced back and forth angrily while ranting. The Defendant said that Mr. White prevented the Defendant from getting involved saying that his brother was "crazy."

The Defendant testified that on January 28, 2014, he was staying at a hotel on Broad Street. He contacted Marylyn Thompson to arrange to see his children. He was unable to contact Marylyn Thompson until 3:00 or 4:00 p.m. Marylyn Thompson told the Defendant that Ms. Thompson and the older child had gone home. At around 5:15 p.m. the Defendant rode with a friend, Prentice Barnette, to East Lake to try to see his children. The Defendant confirmed that the Chattanooga Housing Authority had placed him on a no trespass list for East Lake Courts but that he had told his oldest child that he would spend time with him that week, so he planned to pick up the children and leave.

The Defendant testified that Mr. Barnette dropped him off outside the 6th Avenue unit and left. He knocked on the door and Ms. Tony called out asking who it was and then told Ms. Thompson that the Defendant was at the door. He waited a few minutes, and then Ms. Thompson opened the door holding a "blunt in her hand." The Defendant asked to see the children, and Ms. Thompson said that their older son was at her mother's residence and their younger child was upstairs asleep. The Defendant said he did not believe her because he had just spoken with Marylyn Thompson who said that the

- 10 -

children were at home. The Defendant offered to get the children "ready" if she would "go get them," and Ms. Thompson agreed. She stepped back inside, and the Defendant asked if he could wait inside due to the cold. Ms. Thompson agreed, and he stepped inside and closed the door before asking Ms. Thompson for a cigarette. Ms. Thompson stated she did not have one, and the Defendant walked into the kitchen area where he waited alone for about seven minutes.

The Defendant testified that the victim, Mr. White, and Ms. Thompson came down the stairs, and the victim walked down a "little hallway," making no eye contact with the Defendant. The Defendant observed a "black flag" hanging out of the victim's back pocket with a firearm. The victim walked out the door and shut it behind him. The Defendant explained that he became nervous as soon as he saw the victim. Ms. Thompson and Mr. White walked into the kitchen where the Defendant was waiting. Mr. White was holding a cell phone and "snickering" while looking at the Defendant, and Ms. Thompson looked paranoid "like something was about to happen." Richard Morris then came downstairs and into the kitchen. The Defendant stated that he had been unaware that Mr. Morris was in the residence. The Defendant asked Mr. Morris if he was "over here with my baby mama," and Mr. Morris responded, "no, we cool." Mr. Morris walked over to Ms. Thompson, asked if she was okay, and then "hurried up and got up out of there like something bad was going to happen." About a minute later, the victim re-entered the apartment.

The Defendant testified that he, Ms. Thompson, Mr. White, and the victim were all in the kitchen within close proximity to one another. He testified about the interactions leading up to the shooting as follows:

> [The victim's] in my face like this. Just looking at me. So I was like all right, where [was my child] at. And my baby mamma looked at me and she was like, I don't know. Then I was like, all right. Before I leave why did you do the kids like that the other day. And when she came and got the kids she was being rough with them and hurried them up in the car. And the moment I said that [the victim] was like because I told her to. Ain't no mother f**kin 50th Street in St. Elmo. I was like it is a 50th Street in St. Elmo. You misunderstood what I said. But as I'm saying this I'm not looking at him. I'm looking at [Ms. Thompson]. You know what I'm saying, talking to [Ms. Thompson]. And I said - - I put my hands up, I said look, I don't want no trouble. And when I said I don't want no trouble he said, well, if you don't want no problems it's going to be some problems and went to reach for his firearm and that's when I jumped out - - before I did that I put my hands up, I put my hands in my pocket and he said well, you don't want no problems there's going to be some problems and when

he went to reach for his firearm I jumped back out the way like towards the left because as he's saying I don't want no - - as he's saying if you don't want no problems there's going to be some problems he moves from right there where he at to in front of me.

[I thought] my life was fixin to end or I was going to get seriously injured. Because [the victim] is like way taller and bigger than me. And if he was to grab em it ain't nothing I can do with it.

The Defendant testified that when the victim reached for his firearm, "a .38 Special double action," he took a "quick side step to the left" and then took out his gun "all in one motion." The Defendant said he raised his hand up and then pulled the trigger. At the time the Defendant fired his gun, he estimated that he and the victim were about three or four feet apart. The Defendant admitted that he was not allowed to have a gun on Chattanooga Housing Authority property. The Defendant recalled that, after he fired his gun, the victim fell straight back on the ground and began "scooting" backward. He said that Ms. Thompson was standing behind the victim and that Mr. White was on his cell phone at the time. He said that he began to pace, considering whether he should offer help but felt that he would then have to "wrestle" with Mr. White. He believed it was safer to leave. As he left, he saw Ms. Tony standing at the end of the public hallway.

The Defendant testified that, following the shooting, he ran down to the parking lot and crossed 4th Avenue. At some point he threw the gun out because he was concerned that if he encountered the police "they would deal with [him] violently." As he fled, he was in shock that he had shot someone because he had never "had to use that kind of force to defend." He was also concerned that the witnesses would lie about what had occurred because "they didn't like [him]." The Defendant ran to the Lookout Mountain Suites and smoked "marijuana to calm down." The following morning he left for Memphis. The Defendant stated he did not believe he had done anything "wrong," but he was afraid to contact the police because he did not know "who [he] could trust at the time."

The Defendant testified about the black bandana he had seen tied to the gun in the victim's pocket. He said a black bandana is the type of bandana worn by members of the Gangster Disciples, a gang "out of Chicago, Illinois." The Defendant described the presence of Gangster Disciples as "the deepest gang in Chattanooga as far as numbers." He said there were members in every area of the city. He said the bandanas are tied with "the knot part . . . on the gun." The black "flag" was tied in this manner on the victim's gun and, when the Defendant saw it, he believed it "mean[t] war time." When the Defendant saw the "black flag," he "began to fear for [his] life" and tried to determine

- 12 -

how to escape safely. The Defendant explained that he fled to Memphis in an attempt to avoid gang retaliation against him and his family.

The Defendant testified that he felt "bad" about the shooting but, at the time, felt he had no other choice. He said if he had not shot the victim, he would have been killed.

On cross-examination, the Defendant agreed that in June 2013, he and Ms. Thompson argued and, after the argument, he was issued a no trespassing notification. Despite the notification, two days later he returned to the property heavily intoxicated. He engaged in another argument with Ms. Thompson and punched Ms. Thompson in the face one time. The Defendant denied breaking a window to try to re-enter Ms. Thompson's residence, and he denied shoving his son. The Defendant agreed that he pleaded guilty to domestic assault and vandalism for this incident, served six months in jail, and was released in December 2013. Two weeks after his release from jail, the Defendant contacted Ms. Thompson via Facebook and arranged to pick his children up at Ms. Thompson's residence. The Defendant agreed that both the victim and Mr. White were aware that the Defendant had "beaten up" Ms. Thompson and that "they didn't like that." The Defendant admitted that he shot and killed the victim but maintained that he did so in self-defense.

The Defendant testified that he purchased the gun he shot the victim with from a "junkie" three weeks after he was released from jail. He admitted that he was not allowed to carry a gun because he was a convicted felon. The Defendant agreed that when he went to Ms. Thompson's residence on the night of January 28, 2014, he knew that he was not allowed to be there due to the no trespass notification and he knew that he was breaking the law by carrying the gun. The Defendant denied rehearsing for his testimony at trial. He agreed that the trial was the first time he had claimed self-defense and that he did not contact the police or speak with the police following the shooting about his claim of self-defense. When asked about his refusal to speak with Detective Plumlee following his arrest in Memphis, the Defendant stated that he had "invoked [his] right to remain silent."

The Defendant agreed that he knew "a lot" about gangs but denied being a member of the Traveling Vice Lords. He denied that two of his tattoos had any relationship to gang affiliation. He agreed, however, that he had made posts on Facebook about "King Neal" who is "head of "Vice Lord." The post read "long live King Neal."

Curtis Penney, a CPD officer, testified that he was assigned to the organized crime division, criminal intelligence unit. He explained that this unit identifies and monitors chronic offenders such as gangs or "large scale drug dealings." As part of his job, he gathers "intelligence" through social medial, digital surveillance, interviews, and

- 13 -

interrogations. Officer Penney confirmed that in his sixteen year career with the police department he had "worked a lot" with gang-related crime and had become familiar with the gang presence in Chattanooga. Officer Penney testified that gang members identify themselves by "flagging," which means that they carry a specific color bandana or certain tattoos.

Officer Penney stated that, at that time, gangs were the "biggest threat" to Chattanooga. He said that one of the difficulties with prosecuting cases involving gang members was witness intimidation. Officer Penney confirmed that he was familiar with the East Lake Courts area and said that there were two gangs that were prominent in that area: "[t]he Gangster Disciples, and some of our Crip sets." He said that one of the Gangster Disciples' rivals was the Vice Lords, both gangs originating in Chicago. Defense counsel asked Officer Penney what it would mean if a member of the Gangster Disciples displayed a gun tied with a black flag for a member of the Vice Lords. Officer Penney responded that the Vice Lord member would view this as a sign of disrespect.

Ms. Thompson testified that she could not remember when it occurred, but she recalled talking on the telephone with the Defendant while at her mother's house. While talking with the Defendant, the victim entered the room and began talking to Ms. Thompson about the Defendant's disrespectful conduct toward Marylyn Thompson. The Defendant overheard the victim and said he was going to "come over there." Ms. Thompson said she urged the Defendant not to come over saying, "we don't need those problems." The Defendant came to Marylyn Thompson's residence anyway but arrived as the victim was leaving. Ms. Thompson said there might have been "words exchanged," but the victim got into his truck and left. Ms. Thompson agreed that her family was "pretty angry" with the Defendant because of the 2013 domestic assault. She agreed that the victim was upset that the Defendant had hurt her but denied that the victim made any threats of retaliation against the Defendant.

The State then called Ms. Thompson in rebuttal.[5] The State asked Ms. Thompson if she recalled an occasion at her mother's residence when Mr. White, Ms. Thompson's father, Marylyn Thompson, Anthony Washington, the victim, and she were all there and the victim's eye was swollen. Ms. Thompson confirmed that she recalled that occasion, agreeing that the victim's eye was swollen but denied that the victim was "ranting," had a gun in his back pocket, or had "words" with the Defendant.

---

[5] The trial court allowed the rebuttal at this time, even though the Defendant had not completed his defense, in order to prevent Ms. Thompson from being called to the stand for a third time.

- 14 -

Ms. Thompson confirmed that in June 2013 the Defendant received a trespass notification because the two were arguing at her 6th Avenue unit. Two days later, the Defendant returned late at night between 11:00 p.m. and 12:00 a.m. The Defendant and Ms. Thompson began arguing upstairs over the presence of Ms. Thompson's friend, Ms. Glenn. The argument escalated and the Defendant hit Ms. Thompson from behind with a closed fist and then repeatedly hit her with both fists on her face and arms. The Defendant walked downstairs and began hitting Ms. Glenn, who was sitting on the couch. After hitting Ms. Glenn, the Defendant angrily grabbed their then four-year-old son and "pushed him down." The Defendant paced back and forth and then walked out the front door. Ms. Thompson locked the front door and the public hall door, so the Defendant could not return. The Defendant beat on the door and then went "around to the back" and broke the kitchen window for entry to the apartment. Ms. Thompson ran into the kitchen and was pushing on the Defendant to prevent him from entering. While doing so she cut her arms on the broken glass. The Defendant successfully entered the apartment and hit Ms. Thompson once again before running into the living room while Ms. Thompson remained in the kitchen attending to the cuts on her arms. The Defendant left for a second time, this time he dropped his cell phone, and Ms. Thompson used the phone to call the police. She was later transported to the hospital and received stitches.

The defense then presented testimony from Christopher Robinson, a private forensic consultant, who testified as an expert in the field of firearms analysis, ballistics, shooting reconstruction, and "policies and procedures for testing of DNA." Mr. Robinson stated that he was "certified in the disciplines of firearms analysis, gunshot residue analysis, crime scene reconstruction, shooting reconstruction, and gunshot wound analysis." In evaluating the Defendant's case, Mr. Robinson had reviewed the discovery including materials from the police department, the crime lab reports, photographs, any video and audio recordings. Mr. Robinson visited the crime scene, spoke with the medical examiner, spoke with the Defendant, and had sat through the entirety of the trial listening to all the witnesses.

Mr. Robinson testified that he found the results of the DNA testing "unusual" in that areas tested with "a strong appearance of blood" failed to reveal blood. He attributed this to the possibility that there may have been a cleaner used on the spots that would have diluted the blood evidence, referencing a photograph of the kitchen where a mop and bucket could be seen.

Mr. Robinson also took issue with Agent Scott's testimony that, "the powder could travel four to five feet only on high powered rifles." Mr. Robinson stated that in his own testing with .38 Special cartridges, the cartridges believed to be used in the shooting, the powder had never traveled farther than three feet. Mr. Robinson also examined the victim's shirts and the gunshot hole in the shirts. He found no gunpowder

particles on the shirts, which indicated that the gun muzzle was two to three feet or greater when fired. He then discussed alternative testing that could have been conducted on the shirts to detect gunpowder particles. Mr. Robinson noted that the victim's shirts were also packaged together which is problematic based upon the possibility of the transfer of particles between the items.

Mr. Robinson testified that when he visited the crime scene he entered an adjacent unit with the same measurements as Ms. Thompson's unit. He described the kitchen area of the unit as "extremely tight" and "very close quarters." The medical examiner told Mr. Robinson during their meeting that the trajectory of the bullet had no upward or downward deviation but was a straight path through the chest. Mr. Robinson stated that, given the victim's height versus the victim's height, there should have been an upward deviation in the bullet path unless the victim was moving toward the Defendant in a downward motion, causing a straight path through the body. Mr. Robinson opined that this was consistent with the Defendant's assertion that he acted in self-defense.

On cross-examination, Mr. Robinson agreed that the blood tested that came back as either not human DNA or "a failure to reveal" came from outside on the porch and on a window seal. It did not come from the kitchen.

The Defense recalled Ms. Tony, who testified that she and the victim had dated for two and a half years. She stated that, in her opinion, the victim was not a violent person. Ms. Tony agreed that "Brandon" had told her that, prior to the shooting, the Defendant and the victim had "a fight."

Alicia Merriwether testified that she was a record keeper for the Hamilton County general sessions court. Ms. Merriwether identified four judgments of conviction against the victim. The convictions were for: two separate judgments in 2008 for domestic assault, a 2012 domestic assault, and a 2013 assault.

On cross-examination, Ms. Merriwether confirmed that the judgment for the 2013 assault indicated "[c]ase dismissed without hearing proof."

Lajuane Elston, a Hamilton County criminal clerk's office employee, identified a certified copy of the victim's 2008 conviction for robbery.

In rebuttal, the State called Russ Davis, a TBI forensic scientist. Mr. Davis testified as an expert witness in the field of gunshot primer residue. In relation to this case, Mr. Davis tested a black bandana collected from the victim for gunshot primer residue at the Defendant's request. Mr. Davis did not find gunshot primer residue on the bandana.

Eric Qualls, a Hamilton County Sheriff's Office security intelligence officer, testified that he had received special training in gang intelligence and validating gang members. Officer Qualls confirmed that, in the course of his work, he had come into contact with the Defendant and observed a tattoo of a crescent moon with a five point star on the Defendant's stomach. Based upon his experience with and training about gangs, he stated that the crescent moon with a five point star was a common symbol for the Vice Lords. Officer Qualls had also seen a tattoo on the Defendant's left forearm of a pistol with a "'T' behind it." Officer Qualls opined that the "T" stood for "TVO" or Traveling Vice Lord. Officer Qualls had also observed a post on the Defendant's Facebook page that stated, "long live King Neal." He believed this was a reference to Neal Wallace, "a founding member of the Traveling Vice Lords."

After hearing this evidence, the jury convicted the Defendant of the second degree murder of the victim. The trial court sentenced the Defendant to serve twenty-five years in the Tennessee Department of Correction and dismissed the indictment for possession of a firearm with a violent felony conviction at the State's request. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court improperly allowed into evidence testimony concerning the Defendant's gang affiliation and the Defendant's 2013 domestic assault conviction; (2) the State improperly impeached the Defendant during cross-examination; and (3) the evidence is insufficient to support his conviction.

### A. Character Evidence

The Defendant argues that the State improperly questioned him about the 2013 domestic assault and his gang affiliation. The State responds that the Defendant has waived our review because the Defendant did not object to the testimony at trial, and he is not entitled to plain error review. The State notes that the Defendant introduced proof of the 2013 domestic violation and information about gang affiliation; thus, the State's questions on these issues were proper. We agree with the State.

The "admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *see State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court's exercise of discretion will only be reversed on appeal if the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party

complaining.'" *Robinson*, 146 S.W.3d at 490 (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

### 1. 2013 Domestic Assault

The Defendant has two complaints regarding the admission of testimony about the 2013 domestic assault. The first is that the State improperly questioned him about this incident on cross-examination and, second, that the State improperly questioned Ms. Thompson about the 2013 domestic assault on rebuttal.

### a. Cross-Examination of Defendant

The Defendant asserts that the State improperly questioned him regarding the details of the 2013 domestic assault. Generally, Tennessee Rules of Evidence 403 and 404(b) do not allow evidence into a trial when the danger of unfair prejudice substantially outweighs the probative value. Rule 403 applies to evidence in general and Rule 404(b) applies specifically to prior bad acts by the defendant. If the defense asks about a prior bad act or other normally excluded evidence on direct examination, the defense opens the door to the prosecution being allowed to ask about it on cross examination. *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996). *See State v. Davidson M. Taylor*, No. W2006-00543-CCA-R3-CD, 2007 WL 3026374, at *4 (Tenn. Crim. App., at Jackson, Mar. 6, 2007) (citing NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[4][a] (5th ed. 2005), *no Tenn. R. App. P. 11 application filed*. If the trial court admits prejudicial evidence, as long as it explains its decision, we review under an abuse of discretion standard. *State v. Dubois*, 953 S.W.2d 649, 652 (Tenn. 1997).

During the trial, the trial court held an extensive 404(b) hearing and, after hearing all of the testimony, excluded any testimony about the 2013 domestic assault. The State complied and in its case-in-chief elicited no testimony about the incident. During the defense proof, the Defendant testified extensively about the 2013 domestic assault. On cross-examination, the State then questioned him about the 2013 domestic assault without objection.

The Defendant did not object to the questions asked by the State; therefore, the issue is waived. *See* Tenn. R. App. P. 36(a) (appellate relief generally unavailable when party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); *State v. Schieffelbein*, 230 S.W.3d 88, 118 (Tenn. Crim. App. 2007) ("The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal."). Nonetheless, the defense had already elicited testimony about the 2013 domestic assault, which opened the door to the prosecution's line of questioning. Tenn. R. Evid. 611(b). The Defendant is not entitled to relief on this issue.

### b. Cheslei Thompson

The Defendant argues that the trial court erred in allowing the State, in rebuttal, to question Ms. Thompson about the details of the 2013 domestic assault after its cross-examination of the Defendant. The State maintains that Ms. Thompson properly testified in rebuttal about the Defendant's 2013 domestic assault because the Defendant "opened the door to such questioning."

During cross-examination, the State asked the Defendant questions about the 2013 incident that he had testified about on direct examination. The Defendant denied hitting Ms. Thompson in the kitchen, breaking the glass window in the kitchen, or being rough with their son. He did acknowledge that he hit Ms. Thompson but maintained that it was "just once."

In rebuttal, the State called Ms. Thompson, who testified that the Defendant hit her numerous times, shoved their oldest child, and broke the kitchen window to make re-entry to her residence. No objection to Ms. Thompson's testimony or the State's questioning was made.

As earlier noted, a defendant risks waiver when they fail to make a contemporaneous objection. *See* Tenn. R. App. P. 36(a) (appellate relief generally unavailable when party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."). However, even had the Defendant lodged an objection, Ms. Thompson's testimony was proper rebuttal testimony. Any competent evidence which explains or directly applies to evidence introduced by the accused is admissible in rebuttal. *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). "The state is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" *Id*. (quoting *State v. Cyrus Deville Wilson*, No. 01C01-9408-CR-00266, 1995 WL 676398, at *9 (Tenn. Crim. App., at Nashville, Nov. 15, 1995)). The admission of rebuttal evidence, as well as the scope of such evidence, is within the sound discretion of the trial judge. *State v. Reid*, 213 S.W.3d 792, 831 (Tenn. 2006).

In *State v. Patton*, 593 S.W.2d 913 (Tenn. 1979), the defendant was indicted for shooting and killing his wife. On appeal, the defendant argued that the trial court had erroneously allowed in testimony regarding his violent tendencies toward the victim. Our supreme court held that because the defendant in *Patton* had put his treatment of the victim at issue, it was proper for testimony on the issue of his treatment of the victim to be included in the State's rebuttal. *Patton*, 593 S.W.2d at 917. Therefore, "[p]rior bad

acts are admissible to rebut a defendant's claim of having led a peaceful, normal life." *State v. Nichols*, 877 S.W.2d 722, 732 (Tenn. 1994) (citing *Patton*, 593 S.W.2d at 917).

As stated above, there is no dispute that the Defendant placed the 2013 domestic assault at issue during his proof. Under the case law in our state, proof of prior bad acts to rebut a defendant's contention to the contrary is admissible at trial. We find no abuse of discretion on the part of the trial court in allowing the State to put on proof during rebuttal that contradicted the evidence presented by Defendant. Therefore, we conclude that the trial court did not abuse its discretion in allowing the evidence regarding the Defendant's altercation with Ms. Thompson in June 2013. The Defendant is not entitled to relief as to this issue.

## 2. Gang Affiliation

The Defendant contends that the State, on cross-examination, improperly questioned him about his gang affiliation and his tattoos and that the trial court erred when it allowed the State to call Eric Qualls as a rebuttal witness to testify about gang affiliation. The State responds that because the Defendant introduced testimony about gang affiliation, the State's questioning was proper. We agree with the State.

When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402; *Robinson*, 146 S.W.3d at 490. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In addition, the doctrine of curative admissibility "permits the State, on redirect, to question the witness to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous cross-examination." *State v. Land*, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) (citing *People v. Manning*, 695 N.E.2d 423, 433 (Ill. 1998)). The doctrine allows the State to present otherwise inadmissible evidence "in order to explain or counteract a negative inference" created when a defendant has injected an issue into the case. *Id.* (citations omitted). The doctrine is designed to guarantee fairness in that it prevents a party from using the Rules of Evidence to gain exclusion of certain evidence and then "extracting selected pieces of this evidence for his own advantage, without the Government being able to place them in their proper context." *Id.* (quoting *Lampkins v. United States*, 515 A.2d 428, 431 (D.C. 1986)).

### a. Cross-examination of the Defendant

The Defendant sought to introduce evidence that the victim was a gang member in support of his self-defense claim. Additionally, the defense sought to offer the

Defendant's fear of retaliation by a gang in response to the State's theory that the Defendant's flight was evidence of guilt. The trial court found that the victim's gang affiliation was relevant to the issue of flight and because the State intended to pursue the theory that the Defendant's flight was evidence of consciousness of guilt, it would allow the Defendant to present evidence to rebut the theory. The trial court, however, warned that if the Defendant raised the issue of gang affiliation to show the Defendant's "reasonable perception of the [victim]," the State would be allowed to "explore the issue" as well.

On direct examination, the Defendant testified about his knowledge of gangs and the victim's affiliation with the Gangster Disciples, which caused him apprehension on the night of the shooting and compelled his subsequent flight. On cross-examination, the State asked if the Defendant was affiliated with the Traveling Vice Lords, and the Defendant denied any affiliation. The State also inquired about the Defendant's tattoos, and the Defendant maintained that his tattoos had no relationship to a gang. The defense raised no objection to the State's line of questioning.

The Defendant did not object to the questions asked by the State; therefore, the issue is waived. *See* Tenn. R. App. P. 36(a) (appellate relief generally unavailable when party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); *State v. Schieffelbein*, 230 S.W.3d 88, 118 (Tenn. Crim. App. 2007) ("The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal."). Nonetheless, the defense had already elicited testimony about the knowledge about local gangs, which opened the door to the prosecution's line of questioning. Tenn. R. Evid. 611(b). The Defendant is not entitled to relief.

### b. Rebuttal Witness Eric Qualls

The Defendant argues that the trial court erred when it allowed Officer Qualls to testify about gangs and the Defendant's tattoos. The State responds that Officer Qualls testimony was proper rebuttal evidence. We agree with the State.

We conclude that the trial court correctly allowed Officer Qualls's testimony about the Defendant's gang affiliation in rebuttal. These statements were necessary to rebut the prejudice that the victim was associated with gang members who would seek retaliation and that the Defendant was without adequate protection causing him to flee to Memphis. Thus, we conclude that the trial court did not abuse its discretion by allowing Officer Qualls to testify in rebuttal. *See generally State v. Chearis*, 995 S.W.2d 641, 645 (Tenn. Crim. App. 2005) ("admissibility of testimony and other evidence, as well as the scope of redirect examination, is within the discretion of the trial court, whose ruling will

not be reversed absent an abuse of that discretion"). The Defendant is not entitled to relief as to this issue.

## B. Improper Impeachment

The Defendant complains that the State "sought to penalize [him] for exercising his rights to remain silent." He states that the State erred in "showing to the jury" that the Defendant "refused to talk to detectives." The State responds that the Defendant has waived this issue for failure to raise an objection. Alternatively the State argues that the prosecutor did not inappropriately comment on the Defendant's silence and, if this court should find any error, the error is harmless.

The Due Process Clause of the Fourteenth Amendment forbids impeachment of a defendant at trial for choosing to exercise his Fifth Amendment right to remain silent after receiving *Miranda* warnings. *Doyle v. Ohio*, 426 U.S. 610, 619-20 (1976); *State v. Frasier*, 914 S.W.2d 467, 471 (Tenn. 1996).

The Defendant testified at trial that his act of shooting the victim was in self-defense. Throughout the trial the defense repeatedly questioned witnesses about the victim's aggressive actions toward the Defendant both on the night of the shooting and prior to the shooting. These questions were phrased in a manner that implied that the victim was the first aggressor, and the Defendant feared the "crazy" victim who was a gang member. The State, in response, to the defense theory, questioned the Defendant about his actions following the shooting in light of his testimony that he acted in self-defense.

> State: You've listened to all the testimony; is that right?
>
> Defendant: That the witnesses testified to, yes. That's right.
>
> State: And now you're ready to tell the jury your story.
>
> Defendant: I've already told them my story.
>
> State: Two years later.
>
> Defendant: Two years later, the same way it happened on that night. I've told the jury how it happened that night right here in this courtroom.

State:      That you were – as this is as close as I can get, you were in imminent threat of bodily injury; right?

Defendant:  Yes.

State:      And you couldn't retreat?

Defendant:  No, sir.  Not safely.

State:      And those are your words; right?

Defendant:  Yes.

State:      Those are your words.

Defendant:  Yes.

State:      Not rehearsed.

Defendant:  No.

State:      Nobody else's words.

Defendant:  No, sir.

State:      This is the first time you've ever really publically said that it's self-defense, is that right?

Defendant:  Yes.

State:      You didn't call the police or 911 that night.

Defendant:  No, sir.

State:      You didn't wait around for the police.

Defendant:  No, sir.

State:      You didn't go to a safer place and contact the police and let them know what happened.

- 23 -

Defendant:    No, sir, I was afraid to.

State:        You didn't tell them, hey, I just shot a guy because I was in imminent threat of bodily injury and I couldn't retreat.

Defendant:    No, sir.

State:        You didn't tell them that.

Defendant:    No, sir.  I mean, it's not wise to talk to the police without counsel, and I didn't have counsel at that time.  If I told the police that, I would like to tell the police that with counsel.

State:        And you refused to talk to Detective Plumlee; is that correct?

Defendant:    I'm trying to think of a good way to say this.  I invoked my right to remain silent.

State:        You refused to give a statement to Detective Plumlee; is that correct?

Defendant:    I invoked my right to remain silent.

State:        You refused to tell him your story.

During closing argument, the State only once referenced this line of questioning saying, "Someone who acts in self-defense and has no reason to think that anything is going to happen to them doesn't run off and destroy evidence."

We agree with the State that the Defendant has risked waiver of our review of this issue for failure to lodge a contemporaneous objection.  *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987).  Even so, in our view, the prosecutor, having heard the Defendant's testimony characterizing the victim as a violent gang member, did not err by asking the Defendant on cross-examination about his actions following the shooting that he claimed was in self-defense.  For the most part, the questions asked were a fair response to the defense theory and questioning throughout the trial to that point.  We do note, however,

- 24 -

that the prosecutor's last two questions and the statement, "You refused to tell him your story," were improper comments on the Defendant's invocation of his right to remain silent and was, in our view, clearly outside the scope of a "fair response" to the defense theory. *See United States v. Robinson*, 485 U.S. 25, 32 (1988) (holding that prosecutors are not prohibited from commenting upon a defendant's decision not to testify at trial so long as the prosecutorial comment is simply a "fair response" to defense claims and the prosecutorial comment does not treat the defendant's silence as "substantive evidence of guilt"); *State v. Cazes*, 875 S.W.2d 253, 267 (Tenn. 1994) (applying *Robinson* to reject a *Griffin* claim). WE conclude it was error for the prosecutor to ask the last two question sand make the statement "you refused to tell [Detective Plumlee] your story." Nonetheless, any error, given the weight of the evidence against the Defendant, the prosecutorial error was harmless beyond a reasonable doubt. *See State v. Dotson,* 450 S.W.3d 1, 62 (Tenn. 2014). The Defendant is not entitled to relief as to this issue.

## C. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his conviction for second degree murder in light of the evidence that he acted in self-defense. He argues that he was "justified in using deadly force because the deceased was bigger and stronger than him." The State responds that the jury heard the Defendant's claim that he shot the victim in self-defense and rejected it. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

The evidence, considered in the light most favorable to the State, proves that the Defendant, unlawfully armed with a gun, went to Ms. Thompson's 6th Avenue unit unannounced and in violation of a trespass notification. He wanted to see his children and engaged in an argument with Ms. Thompson, insisting she awaken their sleeping two-year-old child. She declined to do so and asked the Defendant to leave. The victim

entered the kitchen area where the Defendant and Ms. Thompson were arguing and told the Defendant they did not want any "trouble." The Defendant agreed and exited. As the unarmed victim went to close the door behind the Defendant, the Defendant fired his gun at the victim's chest. The Defendant then fled the scene, disposed of the weapon, and hid from police. As a result of the Defendant's conduct, the victim died of a gunshot wound.

The evidence at trial showed that the Defendant shot the victim in the chest, ultimately causing his death. Although there was evidence that the Defendant was fearful and acted in self-defense, the jury rejected this theory, which is within its province. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Thus, the evidence is sufficient to sustain the Defendant's conviction for second degree murder.

### III. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE