STATE of Tennessee, Respondent,

v.

Sam Walter PATTON, Petitioner.

Supreme Court of Tennessee.

Dec. 31, 1979.

Rehearing Denied Feb. 25, 1980.

Norman D. Lane, Donald D. Hildebrand, Nashville, for petitioner.

William M. Leech, Jr., Atty. Gen., Jennifer Helton Small, Asst. Atty. Gen., Nashville, for respondent.

COOPER, Justice.

## OPINION

Petitioner, Sam Walter Patton, was convicted of second degree murder and sentenced to serve thirty years in the state penitentiary for the pistol slaying of his wife, Shirley Patton. The Court of Criminal Appeals affirmed the conviction. This court granted certiorari to determine (1) whether the state had carried its burden of proving beyond a reasonable doubt that petitioner was sane at the time he killed his wife, and (2) whether prejudicial error was committed by the trial judge in permitting the state to cross-examine the petitioner as to "prior bad acts or specific instances of misconduct" and in receiving rebuttal testimony on the same or similar acts of misconduct. From our review of the record, we are convinced that the state carried its burden on the issue of sanity and that no prejudicial error was committed in showing petitioner's propensity for violence.

The record shows that petitioner and Shirley Patton had been married for seventeen years. Their life together was turbulent, being punctuated by numerous arguments and physical confrontations. In 1972, Shirley left petitioner and filed suit for divorce, charging that petitioner had

physically abused her on numerous occasions. Shortly after the divorce action was filed, the parties became reconciled and resumed cohabitation with the result that they had a son born November 14, 1973. The turbulence in the marriage increased after the birth of the baby, with the ultimate result that in 1974 Mrs. Patton again left her husband, taking her baby with her to Alabama, and filed suit for divorce.

Mrs. Patton returned to Nashville on September 15, 1974, preparatory to attending a preliminary hearing in the divorce action. While still at the bus station, she contacted petitioner and told him that she would be staying at the apartment of a mutual friend, Mrs. Jimmy Lee Bean, and that petitioner could see his son there. Petitioner visited the Bean apartment that evening and talked with his wife for about an hour.

Petitioner returned the next morning when only his wife, the baby, and Mrs. Bean's teenage son, Randy, were at home. After checking with Mrs. Patton, Randy admitted petitioner into the apartment, then went upstairs so the Pattons could talk privately. Shortly thereafter, Randy heard scuffling sounds. He went downstairs and saw petitioner with a gun in his hand, standing over Mrs. Patton. Randy struggled with petitioner while Mrs. Patton escaped to the bathroom with her baby. Petitioner kicked open the bathroom door and shot Mrs. Patton in the head. As he was doing so, Randy Bean broke open the glass door to a gun case and obtained an unloaded shotgun, which he attempted to use as a club. Petitioner grabbed the gun and told him:

A. . . . "Randy, don't. I'd have to shoot you."

Q. All right, did he say anything about Shirley at that point?

A. He said, "Shirley is already dead."

Defendant left the Bean residence, taking his son with him. He went to a motel in Springfield, Tennessee, where he registered under a false name and gave a false address. Two days later he surrendered to authorities, contending that he had no recollection of the events described above.

Seven months later, petitioner underwent psychiatric evaluation by Dr. Roger I. White, who concluded that petitioner had been "truly amnesic for the period of several hours on the date of his wife's death," and that "during that period of time, from a legal sense, . . . [petitioner] was insane" and not capable of "knowing right from wrong or controlling his actions or conforming his actions to the expectations of society." Dr. White also expressed the opinion that petitioner's period of insanity was occasioned by the stress by the divorce action and the threatened enforced separation from his child.

A second psychiatrist, Dr. William H. Tragle, who examined petitioner some two years after the death of Mrs. Patton, testified he was unable to determine whether or not petitioner had amnesia and could not determine with any degree of accuracy whether petitioner knew the nature and quality of his acts on the 16th of September, 1974.

■ Where there is evidence tending to show that a person charged with a crime was insane at the time of commission of the crime, as in this case, the burden is on the state to prove that petitioner had the capacity to appreciate the wrongfulness of his conduct and the ability to conform his conduct to the requirements of law. *Graham v. State*, 547 S.W.2d 531, 544 (Tenn.1977). *See also, Edwards v. State*, 540 S.W.2d 641, 646 (Tenn.1976), wherein it is pointed out that:

This burden can be met by the state through the introduction of expert testimony on the issue, or through lay testimony where a proper foundation for the expressing of an opinion is laid, or through the showing of acts or statements of the petitioner, at or very near the time of the commission of the crime, which are consistent with sanity and inconsistent with insanity. *See Brooks v. State*, 489 S.W.2d 70 (Tenn.Cr.App.1972); *Wilcox v. State*, 94 Tenn. 106, 28 S.W. 312 (1896); *Whitmire v. State*, 490 S.W.2d 179 (Tenn.Cr.App.1972).

Petitioner insists "that the State totally failed in its proof that the defendant was sane at the time of the death of his wife and that certainly the State failed to prove this point beyond a reasonable doubt and to a moral certainty." Petitioner argues further that "neither the jury nor the court should be allowed to totally disregard the testimony of a witness [Dr. White] which the prosecution stipulated was eminently qualified to express his opinion." As to the latter argument, there is nothing in the record to indicate that either the jury of the court disregarded the testimony of Dr. White. While it is true that a verdict was not rendered in accord with his testimony, a jury is not required to accept testimony of a psychiatrist on the issue of sanity to the exclusion of lay testimony or to the exclusion of evidence of the actions of the petitioner inconsistent with insanity. *Edwards v. State,* 540 S.W.2d 641 (Tenn.1976). If it were, as pointed out in *Brooks v. State, supra,* "[[i]t] would effectively preempt our jury trial system on sanity issues and replace it with a system of trial by psychiatrists' opinions. We are unwilling, even if we had the power, to saddle society with so basic a change in our system of criminal jurisprudence."

Further, as was pointed out in *Edwards v. State, supra* at 647, "it is settled beyond question that the weight and value of expert testimony is for the jury . . . . Where there is any conflict between expert testimony and the testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case."

In weighing the testimony on the issue of sanity in this case, the jury was faced with the fact that Dr. White first saw petitioner seven months after the shooting of Shirley Patton. The second psychiatrist, Dr. William H. Tragle, did not see petitioner for more than two years after the shoot-

ing. Under the circumstances, Dr. Tragle and his evaluation team could not give an opinion as to the sanity of petitioner at the moment of the shooting. Dr. White could and did testify that petitioner was insane. In explanation, Dr. White admitted that no abnormality on the part of petitioner was shown by any of the tests given by Dr. White's evaluation team, and that his opinion was predicated solely on petitioner's social history, the psychiatric interviews, on his observations of petitioner during the interviews, and his experience as a psychiatrist. He also testified that petitioner's amnesia was caused by an inability to remember "things which make no sense to [him] and which are foreign to [his] make-up."

On the other hand, there is the testimony of Dr. Tragle that under the same circumstances as those faced by Dr. White, he was unable to give an opinion as to the sanity of the petitioner at the moment of the shooting. Further, there was lay testimony that violence was not foreign to petitioner's make-up, thus putting at issue the basis of amnesia as seen by Dr. White. And more significantly, there was the testimony of Randy Bean, who saw petitioner the night before the shooting, who admitted petitioner into the Bean residence on the morning of the shooting, who fought with petitioner in an effort to prevent the shooting, and who was threatened with death by petitioner after the shooting. The effect of the testimony of Randy Bean was that petitioner was sane at the time of the shooting, and that he could restrain his actions at will. Further, it showed clearly that petitioner was not suffering from amnesia, either before or after the killing. In addition, the record shows that on leaving the scene of the killing, the petitioner went to a nearby city and registered in a motel under an assumed name—actions one would expect to be taken by a fugitive and which indicate that appellant knew he had killed his wife.

The verdict of the jury indicates they found the state carried its burden of showing that petitioner was sane at the time of the homicide. In reviewing this finding to

see if it comports with the evidence, we have concluded that it is sufficient to support the verdict of the jury beyond a reasonable doubt. Tennessee Rules of Appellate Procedure, Rule 13(e). *See also Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979).

In granting certiorari, this court posed an issue not raised by the parties, as follows:

> Did the trial judge err in permitting the State to cross-examine the defendant on prior bad acts or specific instances of misconduct and in receiving rebuttal testimony on the same or similar acts of misconduct, *in the absence of testimony placing the defendant's reputation for peace and tranquility in issue?* (emphasis supplied)

Perhaps the issue was inartfully stated in that it presupposed that petitioner's reputation for peace and tranquility was not properly in issue, and that there was no other basis for the admission of the testimony concerning petitioner's "prior bad acts or specific instances of misconduct."

■ As pointed out by the state in its brief, it is settled that "the use of character or reputation testimony is clearly closed to the state during its case-in-chief and that the defendant has the sole prerogative of opening this issue. *Michelson v. U. S.,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *Gray v. State,* 191 Tenn. 526, 235 S.W.2d 20 (1950). The defendant's decision to testify in his own behalf subjects him to examination on his credibility as a witness *State v. Morgan,* 541 S.W.2d 385 (Tenn.1976), but does not place at issue his reputation for traits tending to show guilt or innocence of the crime charged. *Durham v. State,* 128 Tenn. 636, 163 S.W. 447 (1913)."

■ However, on review of the testimony, we find that there is no material basis for the assumption that petitioner's reputation for peace and tranquility was not properly in issue. To the contrary, as pointed out by the state, *"during the direct examination of the defendant,* he was asked several questions about his relationship with the deceased, his wife. He responded that they had had normal marital difficulties, but admitted that she had had him arrested on a warrant alleging assault and battery." (emphasis supplied) This testimony in our opinion opened the way for the state to explore what petitioner considered "normal marital difficulties," and to show that it included violence by petitioner toward his wife. But if this were not sufficient to permit the examination of petitioner and other witnesses relative to "prior bad acts or specific instances of misconduct," the testimony of Dr. White that petitioner's amnesia was due to his inability to remember things which made no sense to him and which were foreign to his nature gave the state the right to show that acts of violence—especially those directed at Shirley Patton—were not foreign to petitioner's nature. Such evidence was relevant and certainly had probative value on the material issue of sanity.

The judgment of the court of Criminal Appeals is affirmed with costs to be paid by petitioner.

BROCK, C. J., and HARBISON, J., concur.

HENRY and FONES, JJ., dissent.

HENRY, Justice, dissenting.

I respectfully dissent.

This case presents a serious controversy involving the right of the prosecutor to attack the credibility of a criminal defendant who has not placed his character or reputation in evidence, by cross-examining on specific acts of conduct.

I am not concerned with those questions relating to the defendant's relationship to, or conduct and treatment of, his wife. Cross-examination as to those matters was well within bounds. My objection is aimed at the action of the State in attempting to force the defendant to place his character in issue and thus attempting to legitimate cross-examination in forbidden areas of the law.

## I.

The first indication of the State's strategy came on the cross-examination of the defendant's lead witness when the following transpired.

Q. What was Mr. Patton's propensity for violence?

A. What do you . . . I don't understand that.

Q. Well, was he a violent man, a nonviolent man, a pacifist?

A. I really don't know what you mean by that, I mean. . . .

This was followed by questions as to whether the witness had seen defendant in a "fight," or "hit anybody," or whether he had observed a specific act of violence directed toward Mrs. Patton, the deceased.

The next overt act in the State's game plan came during the cross-examination of defendant:

Q. Did your wife ever tell you or did you ever . . . did he [a psychiatrist] ever render the opinion that the only problem with you two was that *you were mean as hell* . . . ?

A. No, sir.

Next, defendant was cross-examined on excessive drinking, association with other women (held proper cross-examination by the trial judge), having a shoot-out with Red Caruthers over another woman, driving while drunk, and abusing his own child, while a babe in arms. The Assistant Attorney General asked these questions:

Q. Is it true, sir, you have a propensity for violence?

A. I don't believe so, sir.

Q. Aren't you really a violent man?

A. No, sir.

We point out that at no time, directly or indirectly, had defendant placed his reputation for peace and tranquility at issue. As conceded by the Assistant Attorney General, in her able brief, "[t]he defendant's decision to testify in his own behalf subjects him to examination on his credibility as a witness (citation omitted) but does not place at issue his reputation for traits tending to show guilt or innocence of the crime charged. *Durham v. State*, 128 Tenn. 636, 163 S.W. 447 (1913)."

The questions relating to defendant's violent nature were "too broad," *State v. Morgan*, 541 S.W.2d 385 (Tenn.1976), and were prejudicially and patently unfair. It is in the same category with the proverbial, "have you stopped beating your wife" question. A positive answer would have been enormously prejudicial to a person on trial for a crime of violence. A negative answer, whether true or false, was calculated to produce disastrous consequences as the ensuing narration will develop.

The following question was:

Q. Let me direct your attention sir, to an event that occurred in an alley in Nashville, where an automobile was blocking your way, and you got out and *slashed four tires*. Do you recall that incident?

At this point an objection was made and the jury was excused. After a lengthy colloquy among the court and counsel, the *modus operandi* of the Assistant District Attorney General became clear. He stated to the court:

On cross-examination I asked him the question, "are you a violent person?" It takes a violent person to do this. I asked him, "are you a violent person?" and he said "no." Now, I have a right to disprove what he said.

The prosecutor, by the incompetent questions quoted above, obviously was seeking to force the defendant to put his character at issue in order that he might attempt to tear it down. As Judge Tatum, speaking for the court in *Hatchett v. State*, 552 S.W.2d 414 (Tenn.Cr.App.1977), observed:

The State cannot ask a witness an irrelevant but prejudicial question, and then, under the theory of impeachment, predicate a second irrelevant and prejudicial question upon the defendant's response to the first question. 552 S.W.2d at 415.

This is precisely what the State did after the Trial Judge overruled the objection.

Next he asked about an alleged incident when some men were putting a sewer line across or near his property when defendant allegedly took a shotgun and ran them off.

## II.

The definitive ruling of this Court, speaking through Mr. Justice Fones, in *State v. Morgan*, 541 S.W.2d 385 (Tenn.1976),[1] rescued Tennessee jurisprudence from the quagmire of conflicts and confusion in the area of questions which properly might be propounded to a criminal defendant as to his past conduct.

We adopted Rules 608(b) and 609(a) and (b) of the Federal Rules of Evidence and applied them in the context of the right of the State to cross-examine a criminal defendant about prior convictions. These rules contemplated witnesses and did not necessarily encompass criminal defendants; however, our extension of them so as to provide coverage to criminal defendants is in keeping with the time-honored holding of our courts that, as a general rule, when a criminal defendant "elects to place himself upon the stand as a witness, he can be treated in all respects as any other witness." *Peck v. State*, 86 Tenn. 259, 262, 6 S.W. 389, 390 (1888).

Pertinent to the case at bar, we held, in *Morgan*:

a. that a criminal defendant may be impeached by cross-examination on specific instances of conduct "*if probative of truthfulness or untruthfulness,*" but subject to the duty of the trial judge to "conduct a jury-out hearing for the purpose of determining that the probative value of such evidence outweighs its prejudicial effect." 541 S.W.2d at 388, 390.

b. that the answer of the defendant, when cross-examined on such specific acts, is conclusive, and the State may not elicit any testimony to the contrary in rebuttal. 541 S.W.2d at 389.

c. that specific instances, other than convictions, may not be proved by extrinsic testimony. 541 S.W.2d at 388.

We test the cross-examination by these standards. The first essential is that the specific act of bad conduct must be "probative of truthfulness or untruthfulness." This is the same requirement we laid down in *Collard v. State*, 526 S.W.2d 112 (Tenn. 1975), when we held that "[the] defendant and his witnesses can be cross-examined as to specific acts which involve moral turpitude or as to any misconduct which tends to show the witnesses' lack of veracity or that he is untrustworthy." 526 S.W.2d at 114. But, we cautioned:

> The latter basis for admission of evidence . . . is not to be taken as an open door to admission of every act of misconduct of the defendant . . . on the assertion the evidence is offered to test credibility or to prove untrustworthiness, but *must be limited to specific acts of misconduct which have a direct bearing on the issue of truthfulness or trustworthiness,* such as an act of dishonesty, or the making of a false statement, or the continued and flagrant violation of the laws of the state. (Emphasis supplied). 526 S.W.2d at 114.

*See also State v. Fowler*, 213 Tenn. 239, 373 S.W.2d 460 (1963).

Cross-examination designed to show that this defendant was a whiskey drinker and a womanizer, was "mean as hell," engaged in a shoot-out, and was a man of violence who cut some automobile tires and drew a shotgun on some sewer workers, does not suggest model citizenship; but none, *per se*, is probative on the issue of truth, trustworthiness or veracity. Except to the extent indicated in the ensuing section, they stand in this record as unsupported, unrelated and unverified accusations, all of which were either denied or explained by defendant. These questions were beyond the bounds of propriety.

---

1. The opinion in *Morgan* was released approximately three months and three weeks prior to the trial of the instant action.

### III.

After the defendant rested, the State called two rebuttal witnesses on the specific instances and to introduce extrinsic evidence. The first, a brother of the deceased, testified that defendant had once bragged to him about "beating up and shooting this fellow two or three times," after which they "had thrown him out of a car." This testimony was in response to the defendant's denial of the "shoot-out" testimony wherein he denied he had ever shot anyone. For the same reasons that the prompting question was incompetent, so was this one.

Next this witness testified that defendant had also told him that "he had some connection with dynamiting and blowing up a truck." Aside from the nebulous nature of this testimony, it was extrinsic in character and forbidden by *Morgan*.

The next rebuttal witness testified that defendant had told him of the tire cutting incident and that defendant had related to him "a couple of times of shooting at someone." Further, he testified that defendant bragged to him "about pushing some woman in her car off the Memorial Bridge," and saying "[i]t will teach the old biddy to drive slow and block the traffic." He also testified vaguely about the sewer incident. All this testimony was either extrinsic, or offered in rebuttal as prohibited by *Morgan, supra.*

None of this testimony was permitted as a result of a jury-out hearing at which the trial judge determined that its probative value outweighed its prejudicial effect. This testimony not only was prejudicially degrading, but also was calculated to confuse the minds of the jury and predispose it to believe defendant guilty, thus effectually stripping him of the presumption of innocence.

We hold that this cross-examination and rebuttal testimony constitute prejudicial and reversible error.

This opinion is not to be construed as holding that where a defendant either in person, or through witnesses, affirmatively places his character in issue, he may not be cross-examined on specific acts. Irrespec-

tive of the *Morgan* holding or procedure, he may be cross-examined as to any specific acts tending to offset proof of good character. Nor does this opinion have any bearing on the admissibility of extrinsic proof of other crimes or specific acts tending to show motive, intent, guilty knowledge, identity, absence of mistake or accident and common scheme or plan.

We pretermit discussion of the issue of insanity.

FONES, J., joins in this dissent.