IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2018

## STATE OF TENNESSEE v. SAMUEL ENRIQUE MENDEZ

**Appeal from the Criminal Court for Davidson County
No. 2014-A-648     J. Randall Wyatt, Jr., Judge**

_____

### No. M2018-00371-CCA-R3-CD

_____

The Defendant, Samuel Enrique Mendez, was indicted on two counts of aggravated sexual battery, a Class B felony; and five counts of rape of a child, a Class A felony. See Tenn. Code Ann. §§ 39-13-504, -522. Prior to trial, the State dismissed one of the aggravated sexual battery counts and three of the rape of a child counts. At the close of the State's proof, the State requested that the remaining aggravated sexual battery count also be dismissed. The jury then convicted the Defendant of the remaining two counts of rape of a child, and the trial court imposed a total effective sentence of fifty-four years. On appeal, the Defendant contends that the trial court erred in allowing a defense character witness to be cross-examined about a specific instance of the Defendant's conduct. Following our review, we conclude that the trial court did not comply with the requirements of Tennessee Rule of Evidence 405 in allowing the witness to be cross-examined about the specific instance of the Defendant's conduct, and that the error was not harmless. Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Georgia Felner, Franklin, Tennessee (on appeal); and Paul Julius Walwyn, Madison, Tennessee (at trial), for the appellant, Samuel Enrique Mendez.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Chad Lee Butler and Joseph Edward Clifton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The victim, M.M., was the Defendant's daughter born in August 2000.[1] The victim explained that she lived with her mother, but that she stayed with the Defendant during regular visitations. The victim testified that the Defendant began touching her sexually "around when [she] was [five] or [six]." The victim recalled that the first incident occurred when she was at the Defendant's apartment. The victim testified that the Defendant brought her into the bedroom and told her to play a game on his cell phone. According to the victim, the Defendant pulled her pants and underwear off. The Defendant then touched her vagina until "[i]t just stopped." The victim testified that it felt "uncomfortable." The Defendant told her not to tell her mother. The victim testified that she "didn't tell anyone because [she] didn't want [the Defendant] to be in trouble and [she] was scared and [she] didn't know what to say."[2]

The next incident that the victim recalled occurred when she was seven. The victim remembered that the Defendant's wife, Yanet Balcazar, prepared dinner and cleaned the dishes that night. The victim testified that later that night she was in the living room on "a pallet on the floor" watching television. The victim explained that she never slept in the Defendant's bedroom when she visited him. According to the victim, everyone else in the apartment was asleep when the Defendant entered the living room. The victim testified that the Defendant rubbed her arms and legs. The victim continued, testifying that the Defendant "got on top of [her] and then he stuck [his penis] in [her] vagina." The victim testified that "[i]t was very uncomfortable and it hurt." The victim "told him to stop and he didn't stop." The victim recalled that the Defendant told her "to 'shhh,' because she kept saying 'stop.'" The victim testified that the penetration lasted "a very long time" until the Defendant "eventually stopped."[3]

The victim testified about another incident that occurred when she was eleven and the Defendant penetrated her vagina with his penis.[4] The victim testified that the next incident occurred when she was twelve and that it was the last time the Defendant made sexual contact with her. The victim recalled that she was at the Defendant's apartment in the living room watching television late at night when the Defendant came into the room. The victim testified that everyone else in the apartment was asleep. The victim recalled

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

[2] This incident was the basis for the aggravated sexual battery charge brought to trial. However, the State dismissed the charge at the close of its proof because the victim testified that it occurred before the time period alleged in the indictment.

[3] The State elected this incident as the first rape of a child count.

[4] The State did not elect this incident for either rape of a child count.

that the Defendant was wearing blue and white striped underwear. The victim testified that the Defendant began to rub her arms and legs. The Defendant pulled the blankets off of the victim and then removed her pants and underwear. The victim testified that the Defendant penetrated her vagina with his penis despite the victim's attempts to fight him off. The victim recalled that "once he was done he got down on his knees and he started crying and he told [her] it wouldn't happen again and that he [was] sorry."[5]

The victim reiterated that she was scared to tell anyone about what the Defendant had done to her and that she "didn't want to get [the Defendant] in trouble." However, "just a few days" after the last incident, the victim told a cousin that the Defendant had "touche[d]" her. The victim's cousin told the victim's mother, who called the police. The victim admitted that she told the initial forensic interviewer and the medical staff that examined her that the Defendant had "touched her." The victim explained that she "didn't want to get [the Defendant] in trouble," that she "was really scared," and that she was not "ready to talk about it."

The victim testified that after going to counseling she told a second forensic interviewer that the Defendant had penetrated her vagina with his penis. The victim explained that counseling had "refreshed" her memory and that she was still receiving counseling. The victim asserted that the Defendant had penetrated her vagina with his penis "[a] lot more" between the ages of seven and twelve, but that her "memory [was] very hazy" about those incidents. The victim admitted that she had previously testified that some of the incidents occurred at times when the Defendant had actually not been in Tennessee. The victim also admitted that she attempted to contact the Defendant on Facebook prior to trial.

The victim's cousin, M.L., recalled that she was with the victim in March 2013 when the Defendant called wanting the victim to come stay with him.[6] M.L. testified that the victim's "face just looked like something was wrong" and that the victim "was freaking out." According to M.L., she pulled the victim aside and the victim began crying. M.L. testified that the victim told her that the Defendant had "touched" her. M.L. then told the victim's mother about what the victim had said.

The victim's mother, B.S., testified that she started dating the Defendant when she was sixteen and that she was pregnant with the victim at seventeen.[7] The Defendant was twenty-two when he started dating B.S. B.S. recalled that in March 2013, the Defendant wanted the victim to visit him, but that the victim did not want to. The victim then went

---

[5] The State elected this incident, which occurred when the victim was twelve and was the last alleged incident, as the second rape of a child count.

[6] It is the policy of this court to refer to juveniles by their initials.

[7] We will refer to the victim's mother by her initials in order to protect the privacy of the victim.

-3-

to talk to M.L. M.L. returned a short time later and told B.S. that the victim had said that the Defendant had touched her.

B.S. testified that she began "screaming" at the victim and demanded that the victim tell her what the Defendant had done. B.S. recalled that the victim was crying and said that the Defendant had touched her "down there." B.S. then called the Defendant and asked him what he did "to [her] daughter." B.S. testified that the Defendant responded that it was "not true," that he "didn't do that," and that he was coming over to talk to the victim. B.S. called the police after she got off the phone with the Defendant.

B.S. testified that the victim was interviewed by someone from the Department of Children's Services, interviewed by a forensic interviewer at the Nashville Children's Alliance, and medically examined at Our Kids Center. The victim also began counseling. B.S. testified that about six months after the initial allegations were made she found a document on the victim's cell phone. As a result, the victim was seen by a second forensic interviewer and disclosed to B.S. that the Defendant had penetrated her vagina with his penis.

Caroline Murphy Patterson, a pediatric nurse practitioner at Our Kids Center, testified that she examined the victim. The results of Ms. Patterson's physical and genital examinations of the victim were normal. Ms. Patterson recalled that she saw the victim four or five weeks after the last alleged sexual contact between the victim and the Defendant. Ms. Patterson opined that it was "very unlikely" to find evidence of sexual contact if the examination occurred more than seventy-two hours after the sexual contact. Ms. Patterson was unable to confirm or deny the victim's allegations based on her examinations of the victim.

Anne Post, a forensic interviewer at the Montgomery County Child Advocacy Center, testified that she interviewed the victim. During the interview, the victim disclosed "multiple instances of penile-vaginal penetration" by the Defendant. The victim told Ms. Post that she did not initially disclose the penetration because she did not want the Defendant "to get in even bigger trouble" and because it was "really hard for her to talk about." The victim told Ms. Post that she was disclosing the penetration because "she needed to be brave" and "needed to get it off of her chest."

The Defendant denied raping the victim, testifying that he "wouldn't hurt [his] kids" and that "only a monster could probably do anything like that." The Defendant stated that the victim's allegations were "painful." The Defendant testified that he never had any problems with B.S. The Defendant further testified that the victim visited him less often as she got older and would spend more time on her phone while at his apartment. The Defendant recalled that the victim slept either in the living room or in the bedroom when she visited. The Defendant admitted that there were times when he was

alone with the victim or when he and the victim were awake and everyone else in the apartment was asleep. The Defendant testified that B.S. "was going crazy" and had to be held back by a police officer when the Defendant arrived after the victim made the allegations.

The Defendant's wife, Ms. Balcazar, testified with the assistance of an interpreter. Ms. Balcazar testified that the Defendant was "a good father" to the victim and that the victim always seemed "happy" when she visited. Ms. Balcazar recalled that the victim would sometimes fall asleep on the couch in the living room. On other occasions, the victim would sleep in the bed with Ms. Balcazar while the Defendant slept on the couch. Ms. Balcazar testified that the door to the bedroom was always left open when the victim stayed with her and the Defendant. Ms. Balcazar admitted that there were times when the Defendant was left alone with the victim during her visits.

Near the close of defense counsel's direct examination, Ms. Balcazar testified that she first learned of the victim's accusations when B.S. called the Defendant in March 2013. Defense counsel then asked Ms. Balcazar what she did when she "heard about what was going on." Ms. Balcazar responded as follows, "Well, I was very surprised because I, I just know my husband is incapable, I, I don't know, he's incapable. There are no words to . . . do something like that." Ms. Balcazar testified that she did not "understand" why "all this happened."

The State then requested a jury-out hearing. The State asserted that it had a witness who would testify that the Defendant had "admitted to raping another family member, another [thirteen]-year-old." The State argued that Ms. Balcazar's statement that the Defendant was "incapable" of raping the victim opened the door to cross-examine Ms. Balcazar about her knowledge of the Defendant's "prior rape." The trial court responded that Ms. Balcazar's statement had not opened the door, but that it would allow the State to ask her what she meant by "incapable" during its cross-examination.

The jury returned to the courtroom and the following exchange then occurred:

[Prosecutor]: Okay. All right. And, Ms. Balcazar, you had previously testified on direct that it was your opinion that your husband was entirely incapable of doing anything like this. What did you mean by that?
[Ms. Balcazar]: Well, if I ever would have seen anything, of course, I would have said something. It never happened, never.
[Prosecutor]: Okay. So are you saying that he is incapable of doing this with [the victim]?
[Ms. Balcazar]: To any of his children.
[Prosecutor]: Okay. Just his children?

-5-

[Defense counsel]: Your Honor, I'm going to object.

[Ms. Balcazar]: To, to everybody.

[Defense counsel]: I'm going to object.

[Ms. Balcazar]: To nobody.

. . . .

[Trial court]: It is something she can be asked.

[Ms. Balcazar]: To no, to nobody, to nobody at all. He is incapable. He is incapable of it.

The State requested a second jury-out hearing. Defense counsel argued that his question on direct examination "wasn't opening the door" and that it was the State's cross-examination that led Ms. Balcazar to testify about the Defendant's character. The trial court stated that Ms. Balcazar "kind of expanded" her answer on cross-examination and that it would allow the State to question her outside the presence of the jury about the other alleged rape.

The prosecutor asked Ms. Balcazar if the Defendant had spoken to her about B.S.'s sister. Ms. Balcazar responded that she did not "know who she" was. The prosecutor asked Ms. Balcazar if she was "aware of a [thirteen]-year-old family member that [the Defendant] raped," and Ms. Balcazar responded that the Defendant had "not raped anybody." The prosecutor then asked if the Defendant or defense counsel had a conversation with her "during the whole pendency of this case" about the Defendant's having admitted to raping B.S.'s sister. Ms. Balcazar responded as follows, "No. Well, he has not raped anybody, I mean." The prosecutor asked Ms. Balcazar if the Defendant had "admitted to having sex with a [thirteen]-year-old," and Ms. Balcazar responded, "Well, I don't know really what could have happened." Finally, Ms. Balcazar was asked if she "had conversations" with the Defendant "about these prior rape allegations." Ms. Balcazar responded, "Yes. We talked about it. . . . But it was not true."

Defense counsel argued that the other rape allegation was highly prejudicial and "not probative in this case." Defense counsel noted that the other alleged raped was "uncharged," happened "many years" ago, and "didn't come up until after [the victim's] allegations came up." The State admitted that the other rape allegation was "from some time ago, but [Ms. Balcazar] knew about [the allegation] prior to taking the stand." The trial court concluded that it would not be "exactly fair to the State to let [Ms. Balcazar] say that [the Defendant] wouldn't be capable of doing something like [raping the victim] if she [knew] about . . . some other incident." The State asserted that it would only ask Ms. Balcazar if she was aware of a thirteen-year-old who had "made similar allegations of rape" against the Defendant. The trial court ruled that the State would be limited to that single question.

The jury returned to the courtroom and the following exchange occurred:

[Prosecutor]: Ms. Balcazar, you, before the jury was last in here you had previously testified that you said your husband was incapable of doing anything like this?
[Ms. Balcazar]: Yes.
[Prosecutor]: Okay. However, you are aware of a previous allegation of rape made against your, made against your husband by another [thirteen]-year-old, correct?
[Ms. Balcazar]: It was not rape. It was not rape.
[Prosecutor]: Okay. Can I have on moment, Your Honor? All right. Ms. Balcazar, you, but you are aware of the allegation of rape?
[Ms. Balcazar]: I don't, I don't understand.
[Prosecutor]: Okay. Are you saying that it's your, to your knowledge it was consensual sex with a [thirteen]-year-old?
[Ms. Balcazar]: No.
. . . .
[Prosecutor]: Ms. Balcazar, you previously testified under oath that you were aware of a prior rape allegation by a [thirteen]-year-old; is that correct?[8]
. . . .
[Ms. Balcazar]: There was never an accusation.

At no point did the Defendant request a limiting instruction regarding the State's questioning of Ms. Balcazar about the other rape allegation, and the trial court never provided such an instruction to the jury. At the close of the Defendant's proof, defense counsel objected to the fact that the State was allowed to ask Ms. Balcazar multiple questions regarding the other rape allegation. The trial court overruled defense counsel's objection.

Based upon the foregoing, the jury convicted the Defendant of two counts of rape of a child. The trial court imposed a total effective sentence of fifty-four years. At the sentencing hearing, B.S. testified that when her sister, A.S., found out about the victim's allegations, "she lost it and broke down."[9] B.S. testified that A.S. stated that the Defendant had "done it to [her] too, so [she knew] that he [had] done it to [her] niece." B.S. further testified that A.S. "did not say [any]thing her whole life" about this allegation. However, B.S. also testified that A.S. might have "mentioned something about [it to their] mom like several years ago." B.S. claimed that she confronted the

---

[8] At this point, there was a brief pause in the questioning as the interpreter explained to Ms. Balcazar what the word "allegation" meant.

[9] Because A.S. is the alleged victim of a sexual offense, we will refer to her by her initials.

Defendant about A.S.'s allegation and that the Defendant said A.S. "needed to forgive him."

A.S. testified that when she was twelve, she spent the night at the Defendant and B.S.'s apartment to help B.S. prepare for the victim's birth. A.S. claimed that she fell asleep on their couch after the Defendant took B.S. to work. She awoke to find that the Defendant had undressed her and was penetrating her. A.S. told the Defendant to stop and he responded that "[h]e was almost over." A.S. testified that she made the Defendant take her home after he finished. A.S. claimed that she told her mother, her boyfriend, and B.S. about the rape shortly after the incident. A.S. testified that she confronted the Defendant after she learned about the victim's allegations and that the Defendant admitted to having raped A.S. and apologized to her.

The Defendant raised the issue of the State's questioning Ms. Balcazar about A.S.'s rape allegation in his motion for new trial. In its written order denying the Defendant's motion for new trial, the trial court concluded that Ms. Balcazar had raised the issue of the Defendant's character by stating that the Defendant was "incapable" of committing the charged offenses. The trial court noted that it "did not use the specific language" of the relevant evidentiary rule, Tennessee Rule of Evidence 405. However, the trial court concluded that it found a reasonable factual basis existed for questioning Ms. Balcazar about the other rape allegation when it noted that Ms. Balcazar "'obviously knew something about' the prior alleged incident." The trial court also concluded that it found that the probative value of questioning Ms. Balcazar on the other rape allegation outweighed its prejudicial effect on the substantive issues when it noted that "it would have been unfair to allow [her] testimony . . . to stand unimpeached when she had knowledge of the prior alleged incident." The Defendant now appeals to this court.

## ANALYSIS

The Defendant contends that the trial court erred in allowing Ms. Balcazar to be cross-examined about the other alleged rape. The Defendant argues that the trial court failed to comply with the procedural requirements of Tennessee Rule of Evidence 405.[10] Specifically, the Defendant argues that the trial court failed to make a "judicial determination of whether a factual basis existed or whether the probative value for impeachment outweighed the prejudicial effect." The State responds that the trial court complied with the requirements of Rule 405. The State further responds that any possible

---

[10] The Defendant also argues that the questioning of Ms. Balcazar violated Tennessee Rule of Evidence 404(b). However, Rule 404(b) deals with the admission of other bad acts of a person as substantive evidence. See State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). That did not occur in this case. Rather, Rule 405 is the applicable rule in this case as it governs the impeachment of a character witness regarding a relevant specific instance of a defendant's conduct.

error was ultimately harmless because Ms. Balcazar denied there was another accusation and the evidence of the Defendant's guilt was "overwhelming."

We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). "An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous assessment of the evidence." State v. Mangrum, 403 S.W.3d 152, 166 (Tenn. 2013) (citing Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010)).

Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, a criminal defendant may choose to offer "evidence of a pertinent trait of character." Tenn. R. Evid. 404(a)(1). If a defendant so chooses, the State then can offer evidence "to rebut the same." Id. A defense witness's testimony can raise the issue of a pertinent character trait of the defendant even when "the defense may be surprised that its witness has opened the door." Neil P. Cohen, et al., Tennessee Law of Evidence, § 4.04[4][c] (6th ed. 2011) (citing State v. Patton, 593 S.W.2d 913 (Tenn. 1979)).

Tennessee Rule of Evidence 405 allows, "[a]fter application to the court, inquiry on cross-examination . . . into relevant specific instances of conduct." Tenn. R. Evid. 405(a). The following conditions "must be satisfied before allowing inquiry on cross-examination about specific instances of conduct":

(1) The court upon request must hold a hearing outside the jury's presence,
(2) The court must determine that a reasonable factual basis exists for the inquiry, and
(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Id. There is no dispute that the State properly applied to the trial court to cross-examine Ms. Balcazar regarding the other rape allegation or that the trial court held a jury-out hearing upon the State's request.

However, the State failed to prove during the jury-out hearing that a reasonable factual basis existed for the inquiry. While mentioned by neither of the parties in their briefs to this court, it has long been held in Tennessee that "reports of specific instances of conduct which do not arise until after a crime has been committed are inherently suspect and may not form the basis for inquiry under Rule 405." State v. Nesbit, 978

S.W.2d 872, 883 (Tenn. 1998).[11]   This is because of "the potential for evidence manufacturing" and the fact that "a person accused of a crime is more likely to be the subject of rumor and innuendo." Id.

The only discussion at the jury-out hearing of when the other rape allegation arose was the statement of defense counsel, which was not challenged by the State, that the allegation "didn't come up until after [the victim's] allegations came up." While there was conflicting testimony at the sentencing hearing that A.S.'s allegation arose prior to the victim's, our review is limited to the evidence presented at the jury-out hearing. See State v. Jones, 450 S.W.3d 866, 894 n.6 (Tenn. 2014) (holding the same for a Rule 404(b) jury-out hearing).

Moreover, "a trial court should exercise caution in permitting inquiry under Rule 405 if the character witness subject to impeachment first heard reports of the specific instance of conduct after the crime occurred." Nesbit, 978 S.W.2d at 883. "Under those circumstances, to establish a reasonable factual basis, the prosecution must offer some proof at the jury-out hearing that the specific instance of conduct had been reported before the crime occurred." Id. It appears from the jury-out hearing that Ms. Balcazar did not hear of A.S.'s allegation until after the victim's allegations had come to light. As such, the State was required to present proof at the jury-out hearing that A.S. had reported her allegation prior to the victim's allegations. The State failed to do so; therefore, it failed to establish that a reasonable factual basis existed for the inquiry.

Additionally, the trial court failed to give the jury a limiting instruction regarding the State's cross-examination of Ms. Balcazar. "Even when a trial court determines that an inquiry is permissible under . . . Rule 405, Tennessee law requires the trial court to instruct the jury that the specific acts of conduct were admitted for the limited purpose of evaluating the credibility of the character witness." Nesbit, 978 S.W.2d at 883; see also 7 Tenn. Prac. Pattern Jury Inst. T.P.I.—Crim. § 42.08(a) (22d ed. 2018). Accordingly, we conclude that the trial court abused its discretion in allowing the State to cross-examine Ms. Balcazar regarding the other rape allegation and by failing to issue the requisite Rule 405 limiting instruction.

However, this does not end our inquiry. Non-constitutional errors are subject to harmless error analysis and a final judgment "shall not be set aside unless, considering the whole record, [an] error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). "Errors in admitting evidence are less likely to be harmless in close cases" and

---

[11] The failure of both parties to cite to Nesbit in their briefs is troubling given that it is the leading case in this jurisdiction on Rule 405 and is contained in the annotations to Rule 405 by both Westlaw and LexisNexis.

"[p]ropensity evidence affects the jury's assessment of whom to believe in a case that rises and falls upon assessments of credibility." State v. Rodriguez, 254 S.W.3d 361, 377 (Tenn. 2008). "This danger is particularly acute where the character or credibility defect is one that garners the understandable public revulsion that is directed by the public towards sexually exploitative acts towards children." Id.

Here, the only evidence of the Defendant's guilt was the testimony of the victim. Therefore, "the outcome of the prosecution hinged on the jury's assessment of the credibility" of the victim and the Defendant. Rodriguez, 254 S.W.3d at 377. Regardless of Ms. Balcazar's denials, the prosecutor was allowed to repeatedly ask her if she was aware of another allegation that the Defendant had raped a thirteen-year-old. Furthermore, the trial court did not give the jury the requisite Rule 405 limiting instruction.[12] As such, the State's questioning of Ms. Balcazar about the other rape allegation, "more probably than not, made it easier for the jury to disbelieve" the Defendant and "also freed the jury to conclude more comfortably" that the Defendant had raped the victim. Id. Accordingly, we conclude that the error was not harmless.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed and the case is remanded for a new trial.

_____
D. KELLY THOMAS, JR., JUDGE

---

[12] We note that the failure to give the limiting instruction alone would likely be harmless error given that defense counsel never requested such an instruction. See Tenn. R. Evid. 105 (requiring trial courts to give such limiting instructions "upon request").

-11-