IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 10, 2020

**STATE OF TENNESSEE v. TERMAINE YORK**

**Appeal from the Criminal Court for Shelby County**
**No. 18-07034, C1810401   J. Robert Carter, Jr., Judge**

————————————————————

**No. W2020-00292-CCA-R3-CD**

————————————————————

A jury convicted the Defendant, Termaine York, of first degree premeditated murder for a shooting he committed at his former workplace. The Defendant appeals his conviction, arguing that the evidence presented at trial was insufficient to convict him of first degree premeditated murder because the State failed to establish premeditation. After a review of the record, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Phyllis Aluko, District Public Defender; Tony N. Brayton (on appeal), and Samuel Christian and Kindle Nance (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Termaine York.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Chris Lareau and Reagan Murphy, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

The Defendant was convicted of shooting and killing a former coworker, Mr. Bruce Henderson ("the victim"), after the Defendant was terminated from his employment. The evidence presented at trial showed that the Defendant began working at an IPS Corporation ("IPS") facility in Collierville, Tennessee, around September of 2017. He

started his employment with IPS as a temporary employee but became a full-time employee in February of 2018. He was promoted from working on the molding floor to working on the vacuum former, a machine that formed sheets of material into various products like sink liners or bathtub liners. Operating the machine required two employees, one who worked directly with the machine and another who removed the completed products from the machine and readied them for distribution. The machine emitted a significant amount of heat, so it was dangerous for one employee to be left at the machine alone. The victim operated the vacuum former alongside the Defendant on the second shift, from 3:00 p.m. until 11:15 p.m. Employees on second shift were given a break between 7:00 p.m. and 7:30 p.m., during which time the victim regularly went to the parking lot to eat dinner in his vehicle.

The Defendant performed well at his job until later in 2018, when he began leaving the victim alone at the vacuum former so he could walk around to various parts of the facility. Mr. Avery Moore, the Defendant's supervisor, verbally coached him on approximately three occasions to correct his behavior and issued a verbal warning on September 12, 2018. Each time Mr. Moore coached the Defendant, he would initially correct his behavior but would soon return to leaving the victim alone at the vacuum former. On September 20, 2018, Mr. Moore and Ms. Deanna Holley, a human resources representative, were leading a tour of the facility for corporate management when they noticed the Defendant walk past them and go into the break room for a snack when he was supposed to be working. Mr. Moore and Ms. Holley confronted the Defendant about his behavior, but his "nonchalant" responses indicated to Ms. Holley that he was indifferent to their concerns. Ms. Holley instructed the Defendant to clock out and leave the facility pending an investigation into his conduct, and the Defendant did so.

The next day at approximately 10:45 a.m., Ms. Holley informed the Defendant by telephone that his employment at IPS was terminated, and the Defendant responded, "[O]kay, that's fine." That afternoon, the victim showed up for work and went on his break at 7:00 p.m. as scheduled. Sometime after 7:00 p.m. that evening, an employee approached Mr. Moore and informed him that the victim had been shot in the parking lot during his break. Mr. Moore ran to the parking lot where he found the victim deceased and called the police.

Detective Matt Ledbetter of the Collierville Police Department ("CPD") obtained video footage captured by surveillance cameras at IPS from Mr. Joseph Williams, an IPS employee who set up the surveillance system. The videos were played for the jury, and Detective Ledbetter testified regarding their contents.[1] Detective Ledbetter testified that an individual appearing as a "shadowy figure" and wearing a white mask crept alongside a fence and sat behind a tree. Approximately six minutes later, the individual crept further along the fence, crouched behind a car in the parking lot, and hid behind another

---

[1] The videos were not included as part of the appellate record.

tree. Detective Ledbetter identified the victim's vehicle in the video and testified that the individual crouched and slowly walked toward a dark sedan parked next to the victim's vehicle. Approximately nine minutes later, as the victim opened his vehicle door to get out, the individual came out from behind the dark sedan, fired multiple gunshots at the victim, and then ran away in the direction from which he had approached. Detective Ledbetter testified that the individual ran east toward a tree line and some woods.

Officer Ryan Dunlap established a perimeter on the south side of the IPS scene, but he decided to move to the north side when he realized that no one was at the northern location. As Officer Dunlap drove from the south side to the north side on Poplar Avenue, he observed a slim-built, African-American man approximately five feet, six or seven inches in height wearing muddy black pants, muddy shoes, and a white shirt walking westbound on Poplar Avenue. Officer Dunlap observed that the individual matched the description provided by officers on the scene, so he made contact with the man on Poplar Avenue.

The man informed Officer Dunlap that his name was Trayvon Mcnel, but he could not provide Officer Dunlap with an address or social security number. The individual provided a birthdate to Officer Dunlap, but Officer Dunlap could only recall at trial that the birthdate was in February of 2000. Officer Dunlap could not locate a record of the man's identification using the information provided to him. However, he heard over the radio that a person of interest was named Termaine York, so he looked up an image of the suspect's driver's license in a police database. When he compared the image to the man he had stopped on Poplar Avenue, he concluded that it was an "exact match." Officer Dunlap searched the man and found a bank card with the name "Termaine R. York" on it. At trial, Officer Dunlap identified the Defendant as the man he encountered that night.

CPD Detective William Hill responded to an area on Poplar Avenue where potential evidence had been located approximately one-tenth of a mile away from where police intercepted the Defendant. When Detective Hill arrived, he discovered a folded gray or dark-colored sweatshirt underneath a guardrail with a pistol, a mask, and gloves wrapped inside. Detective Hill photographed the items and collected them as evidence.

CPD Detective Jonathan Watts drew a crime scene sketch, took photographs, and collected evidence at the scene such as a bullet fragment, a red lighter, a bullet taken from a vehicle parked near the victim's vehicle, and three shell casings. Detective Watts investigated a ditch in the woods that ran from IPS to the general area where the Defendant was spotted on the side of the road.

CPD Detective Michael Riley led the investigation and arrived on scene after firefighters failed to revive the victim. Detective Riley left the scene to meet officers talking with the Defendant. After approaching the Defendant, Detective Riley "bagged"

3

his hands to preserve any gunshot residue and transported him to the police station for an interview. Detective Riley and Detective Miller interviewed the Defendant, and the Defendant told Detective Riley that he "was just ready to do [his] time." Detective Riley had a DNA sample taken from the Defendant and directed the collected evidence to be sent to the Tennessee Bureau of Investigation ("TBI") for analysis.

Agent Kathi Gibson with the TBI analyzed the pistol and its magazine. She found a latent fingerprint on the magazine and concluded that it matched the Defendant's fingerprint. A second examiner confirmed her findings. TBI Agent Kasia Lynch analyzed the pistol, shell casings, and a bullet. Agent Lynch found that the pistol was in functioning condition and that the three shell casings and the bullet had been shot from the pistol. A second examiner confirmed her findings.

Agent Gregory Fort with the TBI analyzed the pistol and clothing found on the roadside as well as the Defendant's clothing and shoes worn when he was arrested. Agent Fort performed a chemical test for blood on the Defendant's belt, jeans, and shirt, but the test did not indicate the presence of blood on those items. Testing showed DNA on the pistol and its magazine. The DNA on the pistol could not be matched to a human being. On the magazine, Agent Fort discovered the DNA of two individuals, at least one of whom was male, but he could neither include nor exclude the Defendant as a match. He analyzed the mask and sweatshirt found on the roadside and found DNA that was "consistent with" the Defendant's DNA. Agent Fort testified that the probability of the DNA belonging to someone other than the Defendant's was "greater than the world population." Agent Fort analyzed the left-handed glove and discovered a limited DNA profile from which he could neither include the Defendant nor exclude the victim. The right-handed glove contained limited DNA from which Agent Fort could not derive any conclusions.

Dr. Marco Ross, a medical examiner, performed the victim's autopsy. Dr. Ross identified four gunshot entrance wounds on the victim's head, one at the left temple next to his eye, one in front of his left ear, and two on his left cheek. Doctor Ross observed stippling scattered around the victim's wounds, indicating the gun was fired approximately three to four feet from the victim. Doctor Ross identified four exit wounds on the victim's head, one at the right temple and three on the right cheek. Bullet fragments were found in the bag containing the victim's body and removed from the victim's head. Doctor Ross determined the victim's cause of death to be gunshot wounds to the head and his manner of death to be homicide.

At the conclusion of the trial, the jury found the Defendant guilty of first degree premeditated murder. The trial court sentenced the Defendant to life imprisonment. The Defendant appeals the outcome of his case on the ground that the evidence was insufficient to support his conviction.

## ANALYSIS

The Defendant concedes on appeal that the evidence shows he shot and killed the victim, but he contends that the evidence was insufficient to prove premeditation. Reviewing the sufficiency of the evidence supporting a criminal conviction requires this court to first "examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense." *State v. Stephens*, 521 S.W.3d 718, 723 (Tenn. 2017). Next, we determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If the evidence is insufficient to support the finding of guilt beyond a reasonable doubt made by the trier of fact, its finding of guilt "shall be set aside." Tenn. R. App. P. 13(e). Once a defendant has been convicted, the presumption of innocence is replaced with a presumption of guilt on appeal. *Turner v. State*, 394 S.W.2d 635, 637 (Tenn. 1965). To overcome a presumption of guilt on appeal, the defendant bears the burden of showing the evidence presented at trial was "insufficient for a rational trier of fact to find guilt of the defendant beyond a reasonable doubt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982) (citing *State v. Patton*, 593 S.W.2d 913 (Tenn. 1979)).

The State "is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence." *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This court may not reweigh or reevaluate the evidence, because "[q]uestions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* at 236 (citing *Bland*, 958 S.W.2d at 659). After a guilty verdict has been entered, the testimony of the State's witnesses is accredited, and all conflicts in the testimony are resolved in favor of the theory of the State. *State v. Nichols*, 24 S.W.3d 297, 301 (Tenn. 2000) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).

A defendant's guilt may be found beyond a reasonable doubt supported by direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). Whether the evidence underlying the defendant's conviction at trial was direct or circumstantial, the same standard of review applies. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Here, the Defendant was convicted of first degree premeditated murder. To convict the Defendant of this crime, the State had to prove that the Defendant killed the

5

victim intentionally and with premeditation. T.C.A. § 39-13-202(a)(1). A person acts "intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d). The element of premeditation is a factual question resolved by the jury, *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003), and the jury may infer premeditation from the manner and circumstances related to the killing, *Bland*, 958 S.W.2d at 660. Our supreme court in *Nichols*, 24 S.W.3d at 302, delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may additionally infer premeditation from a lack of provocation by the victim, *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000), or from the establishment of a motive for the killing, *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

When viewed in the light most favorable to the State, the evidence was sufficient for the jury to have found that the Defendant acted with premeditation. The Defendant and victim were co-workers when the Defendant was fired for leaving the victim alone at the vacuum former. The day IPS fired the Defendant, he returned to the facility masked and armed with a pistol during the victim's break when the victim was known to be eating dinner in his vehicle. The Defendant spent minutes approaching the victim's vehicle and preparing to ambush him, shot the victim four times in the head at close range, fled from IPS, concealed the clothing he wore and the gun he used under a nearby guardrail, and then lied to law enforcement about his identity. *See Nichols*, 24 S.W.3d at 302. In response to questioning by law enforcement after the murder, the Defendant said that he "was just ready to do [his] time." The jury could have reasonably inferred from these facts that the Defendant killed the victim in an unprovoked act of violence as a response to his termination from IPS. *See Lewis*, 36 S.W.3d at 96; *Leach*, 148 S.W.3d at 54. Because the evidence was sufficient to convict the Defendant of first degree premeditated murder, the Defendant is not entitled to relief.

6

**CONCLUSION**

Based upon the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE