# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON

## June 8, 2022 Session

## STATE OF TENNESSEE v. JOHN P. STONE

### Appeal from the Circuit Court for Decatur County
### No. 20CR87  Charles Creed McGinley, Judge

_____

### No. W2021-01044-CCA-R3-CD
_____

The Defendant, John P. Stone, was convicted of aggravated burglary following a bench trial, and he received a sentence of twelve years in confinement. On appeal, the Defendant argues that the evidence was insufficient to convict him of aggravated burglary. After reviewing the record, the parties' briefs, and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Mitchell A. Raines (on appeal), Assistant Public Defender – Appellate Division; Robert "Tas" Gardner, District Public Defender; and Tim Nanney (at trial), Assistant Public Defender, for the appellant, John P. Stone.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Senior Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Michelle Morris, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

Ms. Sara Coker owned real property in Decatur County, Tennessee, on which she stored a small camper, a large camper, and a motorized recreational vehicle ("RV"). The real property was located between Horny Head Creek Road ("Horny Head") and Fancy Farm Lane. Horny Head generally ran from east to west, and Fancy Farm Lane

connected to Horny Head and ran southwest from Horny Head to a dead-end. Ms. Coker stored her two campers on the part of her property closest to Horny Head. The RV was located across a creek that ran through her property, and the RV could be accessed via a dirt path which connected to Fancy Farm Lane. Ms. Cindy Goodwin, the Defendant, and Mr. Zachary Ford, the co-defendant, resided in a home at the end of Fancy Farm Lane. Ms. Coker's campers and RV were broken into, and the Defendant and Mr. Ford were arrested and indicted as co-defendants for one count of aggravated burglary.[1] The Defendant and Mr. Ford waived their rights to a jury trial and proceeded to a joint bench trial before the court.

*The State's Proof*

Ms. Coker testified that on January 31, 2020, she received a call from her neighbor, Mr. Offmeyer,[2] who informed her that an air conditioner was missing from one of her campers. By Ms. Coker's request, Mr. Offmeyer entered her property and observed that her campers had been broken into and that items were missing. In response, Ms. Coker visited the property the same day with her boyfriend, Mr. Tony Hill, and she inspected the campers and RV. Someone had entered the small camper by damaging the doors and locks and tried to pull the heater system out of the wall but failed and left it lying on the bed. Someone had broken the lock and hasp off of the large camper. Wires had been pulled out and cut, and the air conditioner, refrigerator, television, DVD player, MP3 player, some tools, and four propane tanks were missing from inside. A generator was missing from outside the large camper. The door to the RV was torn off, and the locks were broken off. Someone had taken a sleeping bag, tried to take a toilet from inside the RV, and "cut out the generator off the back half that r[an] the actual RV." Cabinets and a blue recliner inside were damaged, and the RV was rendered inoperable because someone took parts from the engine compartment. Additionally, a lawnmower trailer, BBQ grills, drain lines, and copper wire were missing from the property. She said that the total cost of the missing items and damages was $16,566.

According to Ms. Coker, she last visited the property in October 2019. She did not give anyone permission to be on her property during this time except for when she asked Mr. Offmeyer to inspect it after he called her. On cross-examination, she stated that Mr. Offmeyer lived two or three houses from her property on Horney Head. She said that Mr. Offmeyer told her that he did not notice the air conditioner missing from her camper "when he c[ame] through that morning" but that on his way home from work that

---

[1] The Defendant was tried in a separate count of the indictment for an unrelated automobile burglary. The conviction resulting from the unrelated burglary is not at issue in this appeal.

[2] Mr. Offmeyer's full name is not apparent from the record.

night, "he just happened to look over . . . and he noticed a hole." She clarified that "his words w[ere] he hadn't noticed anything, he hadn't been paying attention to my property within a week or so" but that "it could have been a week, it could have been two weeks, he just noticed it that day." She stated that she assumed the break-in did not occur the day she inspected the property because "it had rained a few days before" and there was water in the doorway. She said that "it looked like maybe a couple of animals had come in and went out so . . . at least a couple of months anyway." She said that she believed that based on the signs that an animal had been inside, "it didn't look like it was fresh that day," but she agreed she did not know when the break-in occurred.

After inspecting the property and calling the police, Ms. Coker drove along the dirt path leading from the RV to Fancy Farm Lane and encountered Mr. Hill talking to Ms. Goodwin. Noticing that muddy tire tracks led from her property to Ms. Goodwin's home, Ms. Coker asked if she could look around Ms. Goodwin's home for the missing items. Ms. Goodwin declined but offered to look around the home herself. Ms. Coker stated that she passed a red Ford truck when she was "coming in there, and he was going out." She stated that she owned a four-wheeler that she would hook up to the trailer and use to pick up limbs on her property. She stated that "[i]t was operable, and it was covered up with a tarp behind a 10x16 cedar gazebo" so it could not be seen from the road. She stated that it looked like someone had used the trailer to remove the generators because tire tracks she observed on the side of her property connecting the RV to Fancy Farm Lane which appeared to be the same width and pattern as her trailer tires. Additionally, she said that "you could see where the trailer . . . would roll forward because . . . it's got a long tongue, so it's not something that's real easy to turn." She disagreed that tire tracks on her property could have been made by her four-wheeler, which was kept on the other side of the property. Regarding the condition of the creek running through her property, she stated that the "creek is down the road," that it is dry but floods when it rains and "water usually runs down and around." She said that taking her generator from the camper would have required two people because "it's heavy." Additionally, she believed the perpetrators would have had to use Horny Head to exit the property "unless it was nighttime, and they took it back to the woods, that would be the only reason they'd have to go across the creek, to keep somebody from seeing them."

Mr. Hill testified regarding his visit to Ms. Coker's property on January 31, 2020, when he observed that the campers and RV had been broken into and that items were either damaged or missing. He noticed a trail of fresh tire tracks on the path leading to Fancy Farm Lane, where the tire tracks turned into a mud trail leading to Ms. Goodwin's home. He followed the trail to the home, specifically, to a red Ford truck parked in the yard. He encountered the Defendant and confronted him about the stolen items, but the Defendant responded that he did not know anything about the items. Mr. Hill threatened to call law enforcement, and the Defendant left in the truck. Later, Ms. Goodwin drove

up the road to where Mr. Hill was located. Mr. Hill asked Ms. Goodwin if he and Ms. Coker could look around Ms. Goodwin's home, but she declined. He believed the tire tracks on the property were left by whoever stole the items because no one had permission to be on the property and that "[t]hey had to use a truck" to haul the stolen items. However, he did not know exactly when the items were taken, other than that he believed it was "that week" because it had recently rained and the tire tracks were fresh.

Deputy Lee England with the Decatur County Sherriff's Department ("DCSD") responded to Ms. Coker's property on January 31, 2020, and he observed signs that the campers and RV had been broken into. He stated that he entered the property from Horny Head and proceeded to the RV across the creek on foot. He stated that the RV had to "come in off of Fancy Farm because of the creek that was separating the two campers" from the other side of the property. Ms. Coker described to him items that were missing from the campers and RV. During his investigation, Deputy England observed the path leading from the RV to Fancy Farm Lane and "very visible tire tracks that had made several . . . entrances and exits . . . onto and from the property." He photographed the campers and RV as well as the tire tracks on Ms. Coker's property. He stated that "[i]t had been raining a lot in the previous days" and that "[t]here was mud leading from the trail, proceeding south" down Fancy Farm Lane away from Horny Head. He described the trail as "droppings of mud from these tire tracks." Mr. Hill informed Deputy England that he encountered the Defendant at the home to which the mud trail led and that the Defendant had left the home in a truck. Deputy England followed the mud trail down Fancy Farm Lane to Ms. Goodwin's driveway, where the trail ended. He spoke with Ms. Goodwin, who informed him that the Defendant and Mr. Ford lived at the home. Deputy England looked around the outside of Ms. Goodwin's home with her permission, but he did not find any of the stolen items. He did not look inside Ms. Goodwin's home. Deputy England also encountered Mr. Ford and asked him if he knew who took Ms. Coker's items. According to Deputy England, Mr. Ford admitted "that he had helped [the Defendant] remove some items from the property." On cross-examination, Deputy England agreed that he did not inquire about specific items that were removed from Ms. Coker's property but stated that Mr. Ford admitted that he "helped [the Defendant] take a load . . . of items off of that property." Deputy England did not encounter the Defendant. He agreed that he did not specify at the preliminary hearing that Mr. Ford admitted taking the "load" from Ms. Coker's property.

Deputy England stated that he did not know if the tire tracks on Ms. Coker's property were made by the Defendant but that he assumed the tracks were made by whoever took the items. He believed the sets of tracks on the property had "the same kind of design" but agreed the tracks could have reflected a different tread pattern. He agreed that he did not measure the tracks and that he did not compare the tracks to the tires on the Defendant's truck. He did not photograph the mud trail leading to the

Defendant's residence and did not take a statement from the Defendant. He stated that Ms. Goodwin's property was located approximately 200 yards from the path leading from Fancy Farm Lane to Ms. Coker's RV. He agreed he observed pry marks on the RV but did not find any tools that could have been used to make those marks.

DCSD Investigator Steven Whitlock stated that after receiving Deputy England's report, he arrested the Defendant and Mr. Ford. During the arrest, Mr. Ford admitted that "they believed that the property was abandoned and all the stuff was junk, and they had went over to take a load off to the scrap yard." However, Mr. Ford did not identify any specific items that were taken from Ms. Coker's property. Investigator Whitlock contacted the local salvage yard by telephone and asked if anyone with the Defendant's or Mr. Ford's names dropped off any items, but the salvage yard did not have any record of that occurring. He did not visit the salvage yard personally and did not ask about any particular items that were taken from Ms. Coker's property. He stated that it is common for him to be unable to locate stolen items at the salvage yard because thieves would use false names when delivering items and that he was not surprised he was unable to locate the items in this case.

### The Defense's Proof

Ms. Cindy Goodwin testified that she observed Mr. Hill walk to her neighbor's house and then walk up to her house, but she did not talk with him until she encountered him further up the road. She declined Ms. Coker's request to look around her home for the missing items because she did not know her. Law enforcement looked around her home for Ms. Coker's items but did not find anything. She agreed there was scrap at her home because people gave the Defendant "scraps . . . to get it out of their yard" and stated that the Defendant and Mr. Ford would haul the scraps away "when there[] [was] enough of it." She stated that she was present when Mr. Ford talked to Deputy England and that Mr. Ford was extremely intoxicated. On cross-examination, she agreed that she had been drinking on January 31, 2020, and was "buzzed." She stated that earlier in the day, the Defendant used the red truck to "drag[] the gravel road to maintain it, to knock the pot holes down" but that he did so before Mr. Hill approached him.

The trial court found that the Defendant and Mr. Ford entered the campers and RV without Ms. Coker's consent and with the intent to commit theft of property. The court found that Mr. Ford admitted that he and the Defendant "took a load" of items from Ms. Coker's property. The court credited the testimony of Deputy England and Mr. Hill regarding the mud trail leading to the Defendant's truck at Ms. Goodwin's home. Specifically, the court found that the presence of the mud trail corroborated Mr. Ford's statement implicating the Defendant in the aggravated burglary. The court found the

Defendant and Mr. Ford guilty of aggravated burglary and sentenced the Defendant to twelve years in confinement. The Defendant appeals.

## ANALYSIS

We note that the Defendant waived his right to a jury trial and proceeded to a bench trial, "where the trial court as the trier of fact evaluated the credibility of witnesses, determined the weight given to testimony, and resolved all conflicts in the evidence." *State v. Roger F. Johnson*, No. M2018-01216-CCA-R3-CD, 2019 WL 3074071, at *8 (Tenn. Crim. App. July 15, 2019) (citing *State v. Steven Kelly*, No. M2018-00659-CCA-R3-CD, 2019 WL 920361, at *2 (Tenn. Crim. App. Feb. 25, 2019)). The trial court's verdict in a bench trial carries the same weight as a jury verdict. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978); *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

Reviewing the sufficiency of the evidence supporting a criminal conviction requires this court to first "examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense." *State v. Stephens*, 521 S.W.3d 718, 723 (Tenn. 2017). Next, we determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If the evidence is insufficient to support the finding of guilt beyond a reasonable doubt, the finding of guilt "shall be set aside." Tenn. R. App. P. 13(e). Once a defendant has been convicted, the presumption of innocence is replaced with a presumption of guilt on appeal. *Turner v. State*, 394 S.W.2d 635, 637 (Tenn. 1965). To overcome a presumption of guilt on appeal, the defendant bears the burden of showing the evidence presented at trial was "insufficient for a rational trier of fact to find guilt of the defendant beyond a reasonable doubt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982) (citing *State v. Patton*, 593 S.W.2d 913 (Tenn. 1979)).

On appeal, the State "is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence." *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This court may not reweigh or reevaluate the evidence, because "[q]uestions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* at 236 (citing *Bland*, 958 S.W.2d at 659). After a guilty verdict has been entered, the testimony of the State's witnesses is accredited, and all conflicts in the testimony are resolved in favor of the theory of the State. *State v.*

*Nichols*, 24 S.W.3d 297, 301 (Tenn. 2000) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).

A defendant's guilt may be supported by direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). Whether the evidence underlying the defendant's conviction at trial was direct or circumstantial, the same standard of review applies. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The Defendant concedes on appeal that the State proved that Ms. Coker's campers qualified as habitations and that items had been removed from within the campers. However, he argues that the evidence is insufficient to establish that he entered the campers or that he removed any items from them. He argues that Mr. Ford only expressed that they carried a "load" from the property but did not specify the origin of the "load." The Defendant contends that while the evidence supports a finding that he trespassed on the property or committed theft of property, it is insufficient to establish aggravated burglary. The State responds that the evidence was sufficient to support the Defendant's conviction. We agree with the State.

To prove the Defendant committed aggravated burglary, the State had to prove that he entered a habitation and committed or attempted to commit a felony, theft, or assault. T.C.A. § 39-14-402(a)(3) (2018), *repealed by* 2021 Tennessee Laws Pub. ch. 545 (eff. date July 1, 2021), -403(a) (2018), *repealed by* 2021 Tennessee Laws Pub. ch. 545 (eff. date July 1, 2021).[3] A habitation includes:

> (A) . . . [A]ny structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons;
>
> (B) Includes a self-propelled vehicle that is designed or adapted for the overnight accommodation of persons and is actually occupied at the time of initial entry by the defendant; and
>
> (C) Includes each separately secured or occupied portion of the structure or vehicle and each structure appurtenant to or connected with the structure or vehicle[.]

---

[3] The crimes of burglary and aggravated burglary are now codified at Tennessee Code Annotated sections 39-13-1002, -1003.

T.C.A. § 39-14-401(1) (2018). A habitation is occupied when a person is lawfully and physically present any time the defendant is within the habitation. T.C.A. § 39-14-401(2) (2018). The Defendant correctly notes that the entry into an unoccupied RV, such as was the condition of the RV involved in this case, could not result in an aggravated burglary conviction because an unoccupied RV was not considered a habitation by definition. *See* T.C.A. § 39-14-401(1)(B) (2018).

At issue in this case is the identity of the person who burglarized Ms. Coker's campers. The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The trier of fact resolves whether the evidence is sufficient to establish the perpetrator's identity. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

When viewed in the light most favorable to the State, the evidence showed that Ms. Coker's two campers and RV were entered without her consent by someone who stole or tried to steal various items from inside them. In the small camper, someone had unsuccessfully tried to remove the heater system out of the wall. In the large camper, wires had been pulled out and the air conditioner, refrigerator, television, DVD player, MP3 player, some tools, and four propane tanks were missing from inside. The RV was damaged on the inside and rendered inoperable due to mechanical parts being stripped from its exterior. Several items outside of the campers and RV were taken as well. Ms. Coker's neighbor, Mr. Offmeyer, informed her that the burglary could have occurred within the prior week or two weeks but that he just happened to notice an air conditioner missing from one of the campers as he returned home from work. Ms. Coker, Mr. Hill, and Deputy England testified that it had rained in the week prior to January 31, 2020, and water was discovered in one of the campers. Tire tracks imprinted in the ground led from the RV and down to Fancy Farm Lane. The tracks continued as a trail of mud down Fancy Farm Lane to the Defendant's truck parked at Ms. Goodwin's home, where the Defendant also resided. Mr. Hill followed the trail to the Defendant's residence and confronted the Defendant about the stolen items. Deputy England also observed tracks that "made several . . . entrances and exits . . . onto and from the property" and the mud trail leading to the Defendant's residence. Mr. Ford informed Deputy England that he helped the Defendant "take a load" of items from Ms. Coker's property. Mr. Ford also told Investigator Whitlock that "they believed that the property was abandoned and all the stuff was junk, and they had went over to take a load off to the scrap yard." Although the missing property was not located at the salvage yard, Investigator Whitlock testified that it was common for him not to recover stolen items.

While there is no direct evidence linking the Defendant to the burglary of the campers, there is sufficient circumstantial evidence to support his conviction. Mr. Offmeyer told Ms. Coker that the burglary could have occurred in the week or two prior to his discovery of the missing air conditioner. The evidence showed that it had rained in the week prior to January 31, 2020, and water was found inside one of the campers. Ms. Coker's property was muddy, and tire tracks on the side of the property on which the RV was parked led across the path and turned into a trail of mud on Fancy Farm Lane leading straight to the Defendant's truck parked at Ms. Goodwin's home, where he resided. This evidence established temporal proximity between the aggravated burglary of the campers on one side of the property and the burglary of the RV on the other side of the property. Additionally, the burglary of the RV tends to connect the Defendant to the aggravated burglary of the campers. Specifically, the property was divided by a creek which flooded when it rained. Deputy England entered Ms. Coker's property first from Horny Head, and proceeded on foot to the side on which the camper was parked. He stated that the RV had to enter the property from Fancy Farm Lane due to the creek. Ms. Coker stated that she owned a trailer that she would pull with her four-wheeler to pick up limbs on her property. She believed someone had used the trailer to remove the generators because tire tracks she observed on the side of her property connecting the RV to Fancy Farm Lane which appeared to be the same width and pattern as her trailer tires. She disagreed that tire tracks on left on the path leading to Fancy Farm Lane could have been made by her four-wheeler, which was kept on the other side of the property. According to Ms. Coker, taking the generator from the camper would have required two people because of its weight, and she believed the perpetrators would have used Horny Head to exit the side of the property on which the campers were parked. Additionally, Mr. Hill believed whoever stole the items would have had to use a truck to haul them away.

Moreover, Mr. Ford gave two separate statements to law enforcement implicating the Defendant in the theft of items from Ms. Coker's property. Mr. Ford admitted to Deputy England that he "helped [the Defendant] take a load . . . of items off of" Ms. Coker's property. Mr. Ford similarly admitted to Investigator Whitlock that he and the Defendant thought Ms. Coker's property was abandoned and that the items there were junk, so they "went over to take a load off" to the salvage yard. The Defendant claims Mr. Ford's statements to law enforcement implicating the Defendant at most prove they trespassed on Ms. Coker's property or stole items but did not show the Defendant entered the campers. "[O]ur duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011). We cannot say that entry into Ms. Coker's campers to steal property was an unreasonable inference to draw from Mr. Ford's general admissions. This case did not present evidence merely establishing the Defendant's proximity to and attenuated connection with the scene of the crime. *See, e.g., State v. Chad Allen Love*, No. E2010-01782-CCA-

R3CD, 2012 WL 391064, at *8 (Tenn. Crim. App. Feb. 8, 2012) (concluding that the evidence was insufficient to establish the defendant's identity as the perpetrator of a robbery at McDonald's where the only evidence supporting his guilt was that he was found in a laundromat nearby the McDonald's seven hours after the robbery and that the defendant's half-brother was an employee at the McDonald's location). Instead, the evidence established the Defendant's theft of property from Ms. Coker's property and provided a reasonable inference that he entered the campers to accomplish the theft.

Part of the Defendant's argument rests on his contention that Mr. Ford's statements to law enforcement were uncorroborated. At trial, the Defendant waived any objection to the State using Mr. Ford's statements to law enforcement against him despite the fact that Mr. Ford was on trial and did not testify but argued that the State had to establish sufficient corroboration. The Defendant does not contest the State's using Mr. Ford's statement against him but maintains that the State failed to sufficiently corroborate the statement. A criminal defendant in Tennessee cannot be convicted "solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute as stated in State v. Odum*, 137 S.W.3d 572, 583 (Tenn. 2004); *Monts v. State*, 379 S.W.34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013)). "An accomplice is defined as a person who knowingly, voluntarily[,] and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). Generally, a witness qualifies as an accomplice if "the alleged accomplice could be indicted for the same offense charged against the defendant." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997).

Our supreme court has stated that to properly corroborate accomplice testimony,

"[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

- 10 -

*Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803). The corroborating evidence need only be "slight." *State v. Griffs*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). The trier of fact determines whether sufficient corroboration exists. *Shaw*, 37 S.W.3d at 903; *Anderson*, 985 S.W.2d at 16.

There is no dispute in this case that Mr. Ford would be considered the Defendant's accomplice. However, the Defendant's conviction was not based solely on uncorroborated statements. *See Shaw*, 37 S.W.3d at 903. In addition to Mr. Ford's statements to law enforcement, the evidence showed that someone entered onto Ms. Coker's property, broke into her two campers and her RV, and stole or attempted to steal items from inside them. Tire tracks leading from Ms. Coker's property turned into a mud trail on Fancy Farm Lane that led straight to the Defendant's truck. Conditions of the property related to the recent rain suggested that the entry of the campers and the entry onto the other side of Ms. Coker's property occurred at a similar time, such as the water in one of the campers, the creek separating the two sides of the property, and the fresh tire tracks and mud trail leading from the RV to Ms. Goodwin's home. Ms. Coker identified tire tracks resembling the tread of her trailer tires on the path leading to Fancy Farm Lane, despite using the trailer with a four-wheeler kept on the other side of the property. Ms. Coker believed the trailer was used to steal her generators and that it would have taken two people to take the generator from her camper, and Mr. Hill believed the perpetrators used a truck to haul the stolen items away. As a result, there was additional evidence from which the court could infer the Defendant was responsible for the aggravated burglary. In any event, this evidence sufficiently corroborated Mr. Ford's statements. *Shaw*, 37 S.W.3d at 903. We conclude that the evidence was sufficient to support the Defendant's conviction.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 11 -